# UNITED STATES DISTRICT COURT

## DISTRICT OF COLORADO

| | |
|---|---|
| Jose Arroyo, Heather Boehm, Samuel Cordo, and Amber Miller,<br><br>                              Plaintiffs,<br><br>              v.<br><br>Billy Eischen, Christopher Fernandez, Alexander Hall, Michael Harris, Timothy Holcomb, Derek Myers, Joshua Moore, Andrew Privett, Dustin Ross, and Chad Weise,<br>                              Defendants. | Civil Action No. 1:21-cv-01687<br><br><br> Jury Trial Demanded |

## <u>COMPLAINT</u>

Plaintiffs Jose Arroyo, Heather Boehm, Samuel Cordo, and Amber Miller (collectively "Plaintiffs") file this Complaint and Demand for Jury Trial against Defendants Billy Eischen, Christopher Fernandez, Alexander Hall, Michael Harris, Timothy Holcomb, Derek Myers, Joshua Moore, Andrew Privett, Dustin Ross, and Chad Weise (collectively "Defendants"), and state as follows:

## INTRODUCTION

1.      This case is about an inexplicable assault by the Defendants against their fellow United States Bureau of Prisons ("BOP") employees. While the Plaintiffs participated in a mock training exercise conducted by the Defendants and followed the BOP's rules for participation in the exercise, the Defendants threw the rulebook out the window, physically attacked the

Plaintiffs, and unleashed oleoresin capsicum ("OC") spray[1] and munitions on them. This unconstitutional attack has had devastating, lasting effects on the Plaintiffs, and the Defendants must be held accountable for their actions.

## PARTIES

2.      Plaintiff Jose Arroyo is a citizen of the United States and resides in Fountain, Colorado.

3.      Plaintiff Heather Boehm is a citizen of the United States and resides in Florence, Colorado.

4.      Plaintiff Samuel Cordo is a citizen of the United States and resides in Pueblo, Colorado.

5.      Plaintiff Amber Miller is a citizen of the United States and resides in Bozeman, Montana.

6.      At the time of the events described in this Complaint, Defendant Billy Eischen was an employee of the BOP, an agency of the United States of America.

7.      At the time of the events described in this Complaint, Defendant Christopher Fernandez was an employee of the BOP, an agency of the United States of America.

8.      At the time of the events described in this Complaint, Defendant Alexander Hall was an employee of the BOP, an agency of the United States of America.

---

[1] OC spray, colloquially known as pepper spray, is an aerosol spray composed of an inflammatory chemical agent that can cause irritation to the eyes, temporary blindness, lung discomfort, and shortness of breath, and is used by law enforcement officers in emergency situations to temporarily subdue individuals perceived as dangerous.

2

9.      At the time of the events described in this Complaint, Defendant Michael Harris was an employee of the BOP, an agency of the United States of America.

10.      At the time of the events described in this Complaint, Defendant Timothy Holcomb was an employee of the BOP, an agency of the United States of America.

11.      At the time of the events described in this Complaint, Defendant Derek Myers was an employee of the BOP, an agency of the United States of America.

12.      At the time of the events described in this Complaint, Defendant Joshua Moore was an employee of the BOP, an agency of the United States of America.

13.      At the time of the events described in this Complaint, Defendant Andrew Privett was an employee of the BOP, an agency of the United States of America.

14.      At the time of the events described in this Complaint, Defendant Dustin Ross was an employee of the BOP, an agency of the United States of America.

15.      At the time of the events described in this Complaint, Defendant Chad Weise was an employee of the BOP, an agency of the United States of America.

### JURISDICTION AND VENUE

16.      This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the Fourth Amendment to the Constitution.

17.      This court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because those claims are interrelated with Plaintiffs' federal claims and arise from a common nucleus of operative facts such that the adjudication of Plaintiffs' state law claims with Plaintiffs' federal claims furthers the interest of judicial economy.

18.     This court has personal jurisdiction over the Defendants because the Defendants' acts giving rise to the allegations in this Complaint occurred at Federal Correctional Complex Florence ("FCC Florence" or "Complex") in Florence, Colorado.

19.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391 because the events giving rise to the allegations in this Complaint occurred at FCC Florence.

## STATEMENT OF FACTS

### A. The Attack

20.     On the morning of June 20, 2019, the Plaintiffs reported to the administrative building at U.S. Penitentiary Florence ("USP Florence"), which is one of the facilities at FCC Florence, for what they thought would be a normal day of work.

21.     FCC Florence is comprised of several prison facilities, including a maximum-security prison ("ADX") that houses some of the most dangerous prisoners in the federal prison system. In light of the potential security threats inherent in operating such a facility, FCC Florence has a Special Operations Response Team ("SORT"), which is composed of armed officers who are responsible for responding to prison disturbances. SORT frequently runs training exercises involving mock prison disturbances in order to maintain its BOP certification and ensure that other BOP employees at FCC Florence are prepared to safely respond to prison disturbances. When SORT conducts these training exercises, all BOP employees are required to participate and to treat the situation as they would if it were not a mock exercise.

22.     At the time of the events set forth in this Complaint, Defendants Fernandez, Hall, Holcomb, Moore, Ross, and Weise were members of SORT at FCC Florence, and Holcomb was

the team lead. Defendant Myers was the Emergency Preparedness Officer at FCC Florence and worked closely with SORT in that capacity; in particular, Myers was responsible for ensuring that FCC Florence's SORT received the trainings it needed to stay certified by BOP. Defendants Harris and Privett were officers from other federal prison complexes who were visiting FCC Florence that day in their capacities as regional Tactical Trainers whose role it was to facilitate SORT trainings and certify SORT members. Defendant Eischen was the Acting Warden of USP Florence that day.

23.     That day, Plaintiff Amber Miller, a budget analyst, settled into her office within USP Florence's business office ("Business Office").

24.     Plaintiff Samuel Cordo was also there. He worked as an Accounting Technician in the cashier's cage inside the Business Office.

25.     Plaintiffs Jose Arroyo and Heather Boehm sat in the common area of the Business Office. Arroyo, a Case Manager, was completing paperwork. Boehm, a drug treatment specialist who typically worked with inmates, reported for temporary alternative duty in the Business Office that day because she was on crutches after suffering complications from a recent surgery.

26.     Also working in the Business Office that morning were other Business Office employees Kali Webster, Adrian Crespin, Slav Aperyan, and Heather Dunderman; civilian contractor Jessie Patch; and Psychology Technician Anthony Quintiliano, who was completing paperwork in the common area.

27.     After reporting to work, employees in the Business Office discussed a rumor that there might be a mock training exercise that day. Before June 20, 2019, SORT had never used the Business Office area in any of their training exercises.

28.     At 8:00 AM, the employees in the Business Office heard a "man-down" alarm in the lobby of the administrative building, which indicated a possible assault on staff. An officer in the Complex's main control center ("Main Control"), which is located in USP Florence, made an announcement to all employee radios on the Complex that the employee who needed assistance was Defendant Fernandez.

29.     Main Control facilitates official communications at the Complex. After Main Control announces an emergency or a mock training exercise, the Complex's command center ("Command Center") is staffed with supervisors with authority to dictate actions taken by SORT in the course of the emergency or exercise. Defendants Eischen, Harris, and Myers were among the staff in the Command Center listening to radio traffic throughout the mock training exercise that day. In compliance with BOP policy, which requires all employees who are able to respond to a man-down call to immediately respond, Crespin, Aperyan, and Dunderman left the Business Office to report to the lobby. Webster and Plaintiff Miller followed them, and Webster told Miller that hostages were being taken.

30.     When Miller heard this, she realized that SORT was conducting a mock hostage exercise. Webster and Plaintiff Miller returned to the Business Office and told Plaintiffs Arroyo, Boehm, and Cordo that a hostage exercise was underway and that the other Business Office employees—Dunderman, Crespin, and Aperyan—may have been taken as hostages.

31.     As required by BOP policy for responding to a hostage situation, Plaintiffs Miller and Cordo closed the door to the Business Office and locked themselves inside.

32.     The Plaintiffs and the others in the Business Office discussed their plan for the drill and decided that, if the individuals running the mock training exercise tried to breach the door to the Business Office, they would lock themselves in the cashier's cage. This is because BOP policy for responding to hostage situations requires employees to establish a safe haven, if possible, and to remain in the safe haven until an "all clear" announcement. Because Plaintiff Cordo had the only keys to the cashier's cage, the group decided that the cashier's cage would serve well as their safe haven.

33.     Around 8:25 AM, Emergency Preparedness Officer Defendant Derek Myers and another BOP staff member began bashing on the Business Office door and rattling the door handle. Plaintiffs believed the men were trying to breach the Business Office. As a result, the Plaintiffs, along with Webster, Quintiliano, and Patch, immediately retreated to the cashier's cage and locked both the door and the roll-up steel shutters over the cashier's windows.

34.     Two of the Plaintiffs were particularly vulnerable going into the SORT training exercise. Boehm was on crutches and subject to various physical restrictions because of the complications she suffered from a recent surgery. Among those restrictions, Boehm was ordered by her physician not to respond to emergencies or altercations, run or engage in extensive physical activity, or lift objects over 25 pounds. Miller was in the first trimester of an at-risk pregnancy; due to a subchorionic hematoma, abnormal uterine bleeding, and a prior miscarriage, she was observing physical restrictions imposed by her doctor.

35.     The cashier's cage is approximately eight feet long by five feet wide. It contained, among other items, a large L-shaped desk with a built-in hutch, a large safe, a double filing cabinet, two single filing cabinets, and two desk chairs—one of which the Plaintiffs brought into the room so that injured Plaintiff Boehm had a place to sit. Plaintiff Cordo sat in the other desk chair. Because there was so little space for seven people to pile into the cashier's cage, Webster and Quintiliano sat on filing cabinets, Plaintiff Miller and contractor Patch sat on the safe, and Plaintiff Arroyo sat on the floor in front of the door. The room was so small that these seven individuals could hardly move after establishing their seating arrangement.

36.     Once seated inside the cashier's cage, Webster called Main Control to report that the Plaintiffs, Webster, Quintiliano, and Patch were sheltering in place in the cashier's cage and identified each of the individuals in the room by name and job title.

37.     A few minutes later, the Plaintiffs and the others in the cashier's cage heard an announcement from Main Control indicating that Defendant Fernandez had been compromised and was a "bad guy" for the purposes of the drill. As a result, BOP policy required that the Plaintiffs prevent Fernandez, as well as anyone that Fernandez took hostage in the training exercise, from infiltrating their safe haven. Because the announcement identified Defendant Fernandez as a SORT member, the Plaintiffs concluded that SORT was running the mock training exercise.

38.     After the announcement, Dunderman, a fellow Business Office employee, contacted the Plaintiffs, urging them to open the Business Office so that she could escape. The Plaintiffs refused because it would be a violation of BOP policy to compromise their safe haven.

8

They also believed that Dunderman was taken hostage as part of the training exercise and was trying to lure them out.

39.     Shortly after, the Plaintiffs realized that their internal and external telephone lines had been shut off.

40.     The Plaintiffs and the other individuals in the cashier's cage waited there for an "all clear announcement," which never came. In the meantime, they emailed with Robert Solano, an administrative employee whose office was adjacent to the cashier's cage.

41.     The Plaintiffs asked Solano if they were permitted to use the restrooms. Solano went into the hallway and asked Defendant Myers if staff could use the restroom. Solano told Plaintiffs that Myers said they could use the restrooms, but that the area beyond the restrooms was roped off for the exercise. However, a few minutes later, Solano emailed Plaintiff Cordo saying that Solano had been taken hostage. This led the Plaintiffs to conclude that the mock hostage takers were again using hostages in an attempt to lure them out of the cashier's cage.

42.     Shortly after 10:00 AM, an hour and a half after the Plaintiffs sheltered in the cashier's cage, the Plaintiffs heard keys outside the Business Office. They believed that SORT had access to Business Office keys because they had taken Business Office employees hostage. In order to protect their safe haven as required by BOP policy, Arroyo, Cordo, and Quintiliano moved two filing cabinets and a cooler to barricade the door shut.

43.     Just before 11:00 AM, the Plaintiffs heard keys jingling and people rummaging around and realized that SORT officers had entered the Business Office. The Plaintiffs turned off the lights in the cashier's cage and the small fan they had used to keep cool, and stayed silent.

44.     Solano, whom the Plaintiffs knew had been taken hostage, told the Plaintiffs to come out. The Plaintiffs believed that the mock hostage takers were again using Solano in an attempt to lure them into breaking BOP policy and compromising their safe haven.

45.     Defendants Weise and Holcomb, who were rummaging in the Business Office, started calling Plaintiff Cordo's name and said, "Hey, we got your buddy out here," and "Hey guys, come on out."

46.     The Plaintiffs and the other individuals in the cashier's cage sat in silence, as required by BOP policy. The Defendants, however, did not relent. They continued to call Cordo's name and tell the Plaintiffs to come out of the cashier's cage. When the Plaintiffs did not respond, Defendant Weise threatened to throw an explosive device called a flash strip under the door if the Plaintiffs did not come out. That threat made the Plaintiffs nervous, and Cordo shouted back, "No, we are in here."

47.     Defendants Weise and Holcomb, who were outside the cashier's cage, continued to shout and demand that Plaintiff Cordo open the door. When Cordo refused as required by BOP policy, Defendant Moore threatened to shoot OC spray into the cashier's cage. It is a violation of BOP policy to shoot OC spray at fellow BOP staff.

48.     The Plaintiffs grew increasingly uneasy as a result of the Defendants' threats. BOP policy requires SORT officers to declare themselves "out of role" and to identify themselves in order to signal the end of a training exercise. The Defendants did not do this, so Plaintiffs believed the drill was still underway. There also had been no "all clear" announcement. Thus, as BOP policy required, Plaintiffs did not open the door.

49.     Growing increasingly angry at Plaintiffs' refusal to open the door, Defendants began to slam their bodies into the door. Quintiliano positioned himself behind the filing cabinets barricading the door and pushed against the Defendants.

50.     The Defendants continued to escalate the situation, refused to back down, and continued to try to enter the cashier's cage, shouting all the while at the people inside. One of the officers shoved a crowbar through the mailbox slot in the cashier's window and began to pry open the steel shutters over the window.

51.     Webster yelled out to the Defendants that they were destroying government property, but the officers continued to force the window open. The Defendants pried the window open six to eight inches.

52.     Then, without warning or provocation, the Defendants shot a projectile, which Plaintiffs believe was a pepper ball[2] or sting ball,[3] through the opening, barely missing Webster and Plaintiffs Cordo and Boehm. Next, they started ramming the door so hard that the Plaintiffs thought they would break it down.

53.     The Plaintiffs and the other individuals in the cashier's cage grew more and more afraid as the Defendants strayed further and further from BOP policy and became more violent and hostile. Miller, who was pregnant, began screaming for the officers to stop, that they were

---

[2] Pepper balls are projectiles that are shot with pepper-ball guns and that release an inflammatory substance that can cause irritation to the eyes, temporary blindness, lung discomfort, and shortness of breath. Like OC spray, pepper balls are used by law enforcement officers in emergency situations to temporarily subdue individuals perceived as dangerous.

[3] Sting balls are grenades that spray rubber bullets—and may emit OC—upon explosion. Sting balls are primarily used for crowd control in emergency situations.

out of role, and that they were going to harm someone. Twenty-two-year-old civilian contractor Patch was trembling and sobbing. Boehm, who was on crutches, positioned herself between the door and Patch to help shield Patch. Cordo, Arroyo, and Quintiliano braced against the door. As BOP policy required, the Plaintiffs continued to treat the situation as a live hostage situation in which they must fortify their safe haven until an "all clear" announcement.

54.     At this point, Defendant Moore identified himself and threatened to shoot OC spray into the room if the Plaintiffs did not come out. Plaintiff Boehm responded that they could not use OC spray because it was against policy to spray BOP employees during a mock exercise, let alone with a civilian contractor in the room.

55.     The Defendants outside screamed back that they did not care who was inside and repeatedly threatened to shoot OC spray.

56.     At this point, the Plaintiffs were not only afraid that the Defendants were trying to lure them into violating BOP policy but also terrified by the Defendants' hostility and violent threats. Plaintiff Arroyo yelled that the Plaintiffs were not coming out.

57.     Defendant Weise, who was outside the cashier's cage, recognized Arroyo's voice and asked if Arroyo was inside. Arroyo stated that he did not know who they were talking about and asked the officers to identify themselves. Weise responded, "You know who the FUCK I am! Get out of the room."

58.     Defendant Moore and SORT lead Defendant Holcomb continued threatening to use OC spray and break down the door if the Plaintiffs did not come out. The officers continued ramming the door.

59.     Meanwhile, the Plaintiffs kept trying to de-escalate the situation by reminding the Defendants that BOP policy required them to maintain their safe haven until the officers made it clear that the drill was over.

60.     The Plaintiffs told the officers that their telephone lines were turned off and suggested that the officers ask Main Control to turn their phones on and call to verify that the officers were not compromised.

61.     Instead of following protocol to end the drill, the Defendants continued to terrorize the Plaintiffs. The Defendants claimed, falsely, that they had called the Plaintiffs and blamed the Plaintiffs for not answering their phones.

62.     Then, one of the Defendants outside the cashier's cage announced on the radio that they had not had any contact with people inside the cashier's office. Plaintiff Miller shouted that this was a lie.

63.     As the Defendants continued to slam against the door and threaten to shoot OC spray, the Plaintiffs grew more frightened and began pleading with the officers. Quintiliano yelled that he had asthma and they could not use OC spray on him. Boehm yelled, "You need to stop! We have contract staff and staff with medical issues in here!" Miller yelled that she was pregnant and that the officers were taking the training exercise too far.

64.     Cordo peered through a gap in the cashier's window and talked to Defendants Weise and Holcomb through the gap. Cordo asked them how the Plaintiffs could know whether the officers were compromised.

13

65.     Defendants Weise and Holcomb did not respond, but Defendant Moore again threatened to shoot OC spray and started counting down from ten.

66.     Before Defendant Moore finished counting down from ten, Defendant Weise walked up to the cashier's window and shot OC spray into the room, directly at Cordo. Weise did not use one of the small OC aerosol bottles that officers kept on them for personal protection; rather, he used a large MK-9 aerosol bottle, which is intended for crowd control and had to be checked out from Main Control with permission from a warden. The Plaintiffs did not initially feel the effects of OC spray.

67.     Moments later, one or more of the Defendants began shooting into the room nine-millimeter simunition rounds[4] and pepper balls, which are not to be used on BOP staff and have to be checked out from the Complex's armory with permission from a warden. A simunition round hit Cordo's hand.

68.     The Plaintiffs, stuck in the small, unventilated cashier's cage, smelled OC and/or pepper balls and knew it would affect them before long. When asked if it was real OC, Cordo nodded and Arroyo began shouting, "Out of role."

69.     The Plaintiffs repeatedly yelled "Out of role" and Plaintiff Cordo announced that they were removing the barricade and coming out.

70.     Cordo and Arroyo moved the filing cabinets and other furniture that were blocking the door. As Cordo began to unlock the door, Defendants Weise, Hall, and Ross—who

---

[4] Simunition rounds are actual pistol cartridges that are loaded with plastic bullets instead of lead bullets and that are shot from real 9-millimeter pistols.

were armed and wearing tactical gear—kicked the door open and burst into the cashier's office. Weise, Hall, and Ross yelled for the Plaintiffs to get on the ground and pointed guns at Arroyo.

71.    As the officers kicked the door open, they pushed Plaintiff Cordo back several feet into a desk.

72.    Defendant Ross then immediately punched Cordo in the face.

73.    Meanwhile, Defendant Hall punched Quintiliano in the face and shoved him out of the way, knocking Plaintiff Boehm off her crutches and into a safe behind her and pinning Miller's leg into the safe. The Defendants continued attacking the Plaintiffs and Quintiliano for no reason. Over the course of the attack, Defendant Hall repeatedly punched and shoved Quintiliano and slammed Boehm into the safe. Boehm's back buckled at the impact, and she was in pain.

74.    The Defendants then ganged up on Plaintiff Arroyo. Arroyo shouted to the officers that there were injured staff in the room.

75.    Defendant Ross, who had his gun raised, responded, "Oh, yeah?" Ross then immediately pointed his gun at Arroyo and shot Arroyo in the chest with a simunition round from an actual nine-millimeter pistol. The bullet burned through Arroyo's shirt and left a bruise on his chest.

76.    In an attempt to snap the Defendants out of their rage, the Plaintiffs continuously shouted, "Out of role!" However, the officers continued to attack the Plaintiffs and Quintiliano for no reason. Defendant Weise punched Arroyo and Defendant Hall continued beating Quintiliano and Boehm.

15

77.     Miller's leg was pinned between the attackers and the safe she had been sitting on, and she began crying in pain.

78.     Boehm screamed that Defendant Hall was hurting her and that she was on crutches and could not move, but he did not stop. At this point, Boehm began continuously screaming as loud as she could.

79.     Cordo positioned himself between the Defendants and the others in an attempt to end the attack.

80.     Finally, the Defendants abandoned their attack and left the cashier's cage. Cordo, Arroyo, and Quintiliano left behind them, and Webster followed. Two SORT officers then verbally attacked Arroyo in the Business Office.

81.     Defendant Moore screamed at Boehm multiple times to exit the room, and Defendant Holcomb stepped into the cashier's cage and yelled at Moore to "drag her ass out!" Boehm, still positioning herself in front of Patch and Miller, responded that she could not leave the room because she was on crutches and there were papers and objects all over the floor. Defendant Moore kicked a pathway clear and Boehm left the cashier's cage.

82.     Plaintiff Miller was unable to get off of the safe because of the injuries she suffered during the attack and asked Webster for help. Despite Miller's reluctance to accept help from the Defendants, Lieutenant Moore lifted Miller up off the safe. Webster and Miller left the cashier's cage.

83.     When the Plaintiffs exited the cashier's cage, they saw other SORT officers, who had done nothing to stop the violence, in the common area of the Business Office.

84.     After the attack, the Defendants refused to take responsibility for what had happened.

85.     Defendant Myers, who was standing in the Business Office, called the Command Center on his radio and relayed: "End of mock, end of mock, we have a real situation up here." However, when Boehm asked Defendant Myers why he let the training exercise escalate into violence against BOP staff members, he shouted that it was not his team and that they would "figure it out."

86.     Shortly after, Defendant Holcomb began shouting at Boehm and asking why the Plaintiffs refused to leave the cashier's cage. Boehm explained that they were complying with BOP policy for hostage situations and asked why the Defendants sprayed BOP staff and a civilian contractor with OC spray. Defendant Holcomb responded, "You should have just opened the door." Boehm then asked why they attacked the Plaintiffs and Quintiliano and shot Arroyo. Holcomb simply responded, "Why couldn't you just open the door?"

87.     When Miller accused Holcomb of poor leadership of SORT, Holcomb threatened her to quit yelling at him before she got herself in trouble.

88.     Immediately after Holcomb's threat, Miller and Boehm sought answers from Defendant Moore. However, Holcomb repeatedly yelled, "Moore!" and then shouted, "Moore! Let's go! You are done FUCKING talking to her!"

89.     After the attack, Plaintiffs learned that Defendant Myers, as the Emergency Preparedness Officer, was responsible for planning and facilitating the mock training exercise. Defendant Myers had briefed Defendant Fernandez on the training exercise before the exercise

took place. Additionally, regional SORT Tactical Trainers Michael Harris and Andrew Privett were responsible for facilitating the mock training exercise. Defendant Privett was the Tactical Trainer that served as the Observer for the exercise; in that role, he was present with the SORT members outside of the cashier's cage and was responsible for ensuring that the exercise went as planned.

90.     After the Defendants finally retreated, the Plaintiffs began to take stock of the numerous injuries and severe psychological trauma that Plaintiffs sustained as a result of Defendants' unconstitutional attack.

91.     Arroyo sustained a severe contusion in the center of his chest, where he was shot. There were burn marks on his shirt where the simunition round struck him.

92.     Miller, who was pregnant and had suffered a miscarriage the previous year, left the cashier's cage clutching her stomach in pain. In addition to hurting her leg, she feared that the attack had impacted her pregnancy and she was rushed to the hospital by ambulance. Miller began therapy to deal with the psychological repercussions of the attack and suffers from chronic post-traumatic stress disorder as a result of the attack.

93.     Boehm, who had been on Temporary Alternative Duty for several months and was on crutches after complications from a recent surgery, was also rushed to the hospital by ambulance. By the time the ambulance arrived, Boehm was in too much pain to stand. While in the ambulance, Boehm experienced a severe allergic reaction to a pain medication that the medical technicians administered to her. Boehm has had several surgeries and continues to

require additional surgeries and long-term medical care as a result of the attack. Boehm is also continually in therapy to deal with the psychological effects of the attack.

94.     Cordo felt shaken after the attack and received medical attention for his physical injuries, including the effects of the OC spray. Cordo has been diagnosed with post-traumatic stress disorder and continues to feel the psychological effects of the traumatic experience.

### B. The OIG Investigation

95.     After the Defendants' attack on the Plaintiffs, the Department of Justice Office of the Inspector General ("OIG") conducted an investigation into SORT mock training exercises.

96.     The OIG concluded that "inappropriate and dangerous events transpired" in the attack described above.

97.     The OIG further concluded that the Defendants violated BOP policy by spraying real OC spray during the exercise and firing training ammunition at "physically vulnerable" staff members.

98.     The OIG recommended that the BOP suspend all SORT mock training exercises until it developed comprehensive guidelines and written policies for these exercises.

99.     To this day, the Defendants have provided no explanation, reasonable or otherwise, for their terrifying and unjustified assault on the Plaintiffs, who were merely following BOP training protocols by remaining in their safe haven during a hostage training exercise.

## CAUSES OF ACTION

## COUNT I: EXCESSIVE FORCE IN VIOLATION OF FOURTH AMENDMENT

### (*BIVENS*)

100.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

101.    At all times relevant to the allegations in this Complaint, Defendants acted under color of federal law.

102.    Under the Fourth Amendment, Plaintiffs had a clearly established constitutional right to be secure in their person against unreasonable seizure and excessive force.

103.    Defendants used excessive force in seizing plaintiffs on June 20, 2019, including but not limited to unreasonably restraining and incapacitating Plaintiffs by applying OC spray, punching, shoving, grabbing Plaintiffs and pulling them out of the cashier's cage, and otherwise unnecessarily using physical force and verbally threatening Plaintiffs.

104.    Defendants used excessive force against Plaintiffs without probable cause to believe that Plaintiffs posed any physical danger to anyone, and without giving Plaintiffs an opportunity to safely comply with their requests.

105.    Defendants did not have a legal basis to seize Plaintiffs. There was no reasonable suspicion or probable cause to believe that Plaintiffs had committed any crime, or that they posed a threat to the safety of themselves or others.

106.    Defendants' use of force against Plaintiffs was excessive and objectively unreasonable under the circumstances.

107.    Defendants actions were intentional, willful, wanton, obdurate, and in gross reckless disregard for Plaintiffs' rights.

108.    Defendants violated Plaintiffs' clearly established constitutional rights to be free from unreasonable seizure and excessive force.

109.    Defendants' use of excessive force proximately caused Plaintiffs' damages and injuries, including physical injury, physical pain and suffering, lost liberty, and psychological and emotional distress.

## COUNT II: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESSS

110.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

111.    At all times relevant to the allegations of intentional infliction of emotional distress, Defendants acted outside the scope of their employment for the BOP.

112.    Defendants engaged in extreme and outrageous conduct.

113.    Defendants engaged in such extreme and outrageous conduct recklessly or with the intent of causing Plaintiffs severe emotional distress.

114.    Defendants' conduct caused the Plaintiffs damages and injuries, including severe emotional distress.

## COUNT III: CIVIL CONSPIRACY

115.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

21

116.    At all times relevant to the allegations of civil conspiracy, Defendants acted outside the scope of their employment for the BOP.

117.    Defendants agreed to, and did engage in extreme and outrageous conduct against Plaintiffs.

118.    The actions that Defendants performed to accomplish their goal caused Plaintiffs' injuries.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

A.      Award Plaintiffs compensatory damages as to all Defendants, in an amount to be determined at trial;

B.      Award Plaintiffs punitive damages as to all Defendants, in an amount to be determined at trial;

C.      Enter a permanent injunction to prevent future Constitutional violations by the Defendants;

D.      Award Plaintiffs reasonable attorneys' fees and costs as to all Defendants; and

E.      Grant Plaintiffs such other and further relief as the Court deems just and proper.

Dated: June 18, 2021                    Respectfully submitted,

By:   /s/ Ed Aro
      Ed Aro
      Kathleen K. Custer
      Rachel Ryan
      Kristen Proe
      Arnold & Porter Kaye Scholer LLP
      1144 Fifteenth Street, Suite 3100
      Denver, CO 80202-2569
      (303) 863-1000
      Ed.Aro@arnoldporter.com
      Katie.Custer@arnoldporter.com
      Rachel.Ryan@arnoldporter.com
      Kristen.Proe@arnoldporter.com
      *Attorneys for Plaintiffs*