**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:21-cv-01687-RM-NRN

JOSE ARROYO,
HEATHER BOEHM,
SAMUEL CORDO, and
AMBER MILLER,

        Plaintiffs,

v.

ALEXANDER HALL,
TIMOTHY HOLCOMB,
DEREK MYERS,
JOSHUA MOORE,
ANDREW PRIVETT,
DUSTIN ROSS, and
CHAD WEISE,

        Defendants.

---

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
TO SET ASIDE THE UNITED STATES' WESTFALL ACT CERTIFICATION
AND NOTICE OF SUBSTITUTION**

---

        Plaintiffs Jose Arroyo, Heather Boehm, Samuel Cordo, and Amber Miller respectfully

request an order granting summary judgment in their favor setting aside the United States' Westfall

Act Certification (ECF No. 59-1) and the Notice of Substitution (ECF No. 59).

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 3

STATEMENT OF FACTS ................................................................................................... 3

PROCEDURAL HISTORY................................................................................................ 12

STANDARD........................................................................................................................ 13

ARGUMENT ...................................................................................................................... 14

   I.   Defendants Acted Outside the Scope of Their Employment Because
      Their Acts Were Intentional and Outrageous ..................................................... 15

   II.  Defendants Acted Outside the Scope of Their Employment Because
      Their Intent Was Not to Further the BOP's Business......................................... 17

        A.  Defendants Acted on Personal Frustration When They Attacked Plaintiffs............... 17

        B.  Defendants' Excuses Are Post Hoc Attempts to Rationalize Egregious Behavior .... 20

   III. Defendants Acted Outside the Scope of Their Employment Because
      Their Actions Were Not Assigned, Necessarily Incidental, or Customary........................ 23

        A.  Defendants' Attack on Plaintiffs Was Not "Assigned" Work or
           "Necessarily Incidental" to Assigned Work ................................................................ 23

        B.  Defendants Wholly Abandoned the Behavior That is "Customary" in
           BOP's Business............................................................................................................ 28

CONCLUSION..................................................................................................................... 30

## INTRODUCTION

This case is about an inexplicable assault by Defendants against Plaintiffs, their Federal Bureau of Prisons ("BOP") coworkers, during which Plaintiffs sustained serious physical and psychological injuries.  In the context of a training exercise involving a fake hostage taker scenario, Defendants deployed the kind of force that is reserved only for real and serious emergencies on Plaintiffs, who were simply doing everything in their power to follow BOP policy for hostage situations.  Defendants shot Simunition rounds at Plaintiffs from a submachine gun, sprayed oleoresin capsicum ("OC") at Plaintiffs from an MK-9 or crowd-control-sized canister, and punched and shoved Plaintiffs while Plaintiffs screamed the safety code word that was supposed to end the exercise if something went awry.  Despite Defendants' egregious conduct, the United States certified that Defendants were acting within the scope of their employment when they committed these acts.  Plaintiffs now move to strike that certification in the hopes of holding accountable the individuals who are responsible for the physical and psychological injuries they have endured for the past three years—and will continue to endure—as a result of the unjustifiable attack they suffered while trying to do their jobs.

## STATEMENT OF FACTS

On June 20, 2019, a major mock exercise was conducted in the administrative building of the U.S. Penitentiary facility ("USP Florence") at Federal Correctional Complex Florence ("FCC Florence" or the "Complex") in Florence, Colorado.  MSUMF No. 1. Major mock exercises are conducted twice annually and serve multiple purposes.  MSUMF No. 11.  First, major mock exercises are part of the demanding week-long annual certification process for FCC Florence's crisis management teams—the Crisis Negotiation Team ("CNT"), whose job it is to "use[] crisis

intervention techniques" such as negotiation to "resolve hostage situations safely," and the Special Operations Response Team ("SORT"), a tactical team that is "activated only with the Warden's direct authorization . . . if the incident escalates" and "everything else fails" to bring the situation under control. MSUMF Nos. 8–11. Second, in addition to providing an opportunity for SORT and CNT to show that they possess the required knowledge and skills to be certified by BOP, mock exercises also provide an opportunity for other BOP staff to practice applying BOP's emergency policies and procedures and for the Complex to evaluate its staff's readiness for emergencies. MSUMF No. 12.

The scenario for the June 20, 2019 major mock exercise involved a staff member (played by former SORT member Lieutenant Christopher Fernandez) entering the Complex's administrative building as an active shooter and taking hostages. MSUMF Nos. 15, 19. After Lieutenant Fernandez entered the administrative building with a firearm around 8:00 am, a man-down alarm—which signals that a staff member requires assistance and that all staff capable of responding should respond immediately—sounded in the lobby and Main Control announced that the staff member who needed assistance was Lieutenant Fernandez. MSUMF Nos. 15–18. Plaintiffs Sam Cordo and Amber Miller, who were employees in the Business Office at USP Florence, case manager Plaintiff Jose Arroyo, and drug treatment specialist Plaintiff Heather Boehm, were in the Business Office in the administrative building when they heard the man-down alarm. MSUMF Nos. 2, 16. Boehm was working in the Business Office because she was on Temporary Alternative Duty due to complications from a recent surgery that left her on crutches. MSUMF No. 3. Miller was almost three months into an at-risk pregnancy. MSUMF No. 4.

When staff responded to the man-down alarm, many were taken hostage, including Business Office staff Heather Dunderman, Adrian Crespin, and Slav Aperyan.  MSUMF No. 19. Plaintiffs learned that Dunderman, Crespin, and Aperyan had been taken hostage through Business Office employee Kali Webster, who returned to the Business Office after attempting to respond to the man-down alarm.  MSUMF Nos. 20, 22.  Webster had also encountered the Complex's Emergency Preparedness Officer, Defendant Derek Myers, who told her that she and Plaintiffs should find a safe room to shelter in place as required by BOP policy for hostage situations. MSUMF No. 21.  Plaintiffs followed this directive and locked themselves (along with Business Office employees Kali Webster and Anthony Quintiliano and civilian contractor Jessie Patch) inside the Business Office.  MSUMF No. 23.

Meanwhile, the Complex's crisis management teams assumed the roles and positions prescribed to them for such emergency situations.  In keeping with BOP policy, CNT began to execute a plan for peaceful neutralization of the mock hostage taker.  MSUMF No. 24.  Defendants Hall, Holcomb, Moore, Ross, and Weise, who were members of SORT, reported to various posts to prepare for SORT's potential response to the mock hostage situation in the event that the mock hostage taker could not be peacefully neutralized.  MSUMF No. 5, 6, 25.  Defendant Privett, a Regional Tactical Trainer, who was visiting FCC Florence to supervise SORT's annual certification week and evaluate SORT members' performance, assumed his role of overseeing SORT's participation in the major mock exercise.  MSUMF Nos. 7, 25.

Around 8:25 am, Plaintiffs realized that the hostage taker may have access to Business Office keys through the Business Office employees taken hostage.  MSUMF No. 26.  To ensure that their safe haven would not be compromised, Plaintiffs—along with Webster, Quintiliano, and

Patch—moved to the cashier's cage inside the Business Office for which Plaintiff Cordo had the only key and locked themselves inside.  MSUMF No. 27.  Later, they would further fortify their safe haven by barricading the door to the cashier's cage with furniture and objects.  MSUMF No. 36.  After moving to the cashier's cage, Webster called Main Control to provide a "staff accountability" report and reported that the seven of them were sheltering inside the cashier's cage and were not compromised.  MSUMF No. 28.

Plaintiffs heard an announcement over staff radios indicating that "SORT team member Lieutenant Fernandez" was a "bad guy" for purposes of the mock exercise.  MSUMF No. 29.  Main Control instructed staff not to respond to "SORT Lt. Fernandez."   MSUMF No. 29.   This announcement led Plaintiffs to believe that SORT may be compromised and working with the hostage taker for purposes of the mock exercise.  MSUMF No. 30.

After the announcement, Dunderman, who had been taken hostage, called Plaintiffs, urging them to open the Business Office door so that she could escape.  MSUMF No. 31.  Plaintiffs refused because they believed that Dunderman was attempting to lure them out of their safe haven and compromising their safe haven would be a violation of BOP policy.  MSUMF No. 32.  It is a common training practice for mock hostage takers to use compromised staff to attempt to lure other staff into violating BOP policy, MSUMF No. 33, and BOP policy is clear that staff are not to comply with such luring efforts or to give up their safe haven, MSUMF No. 34.  Shortly after Dunderman called Plaintiffs, the internal and external phone lines at FCC Florence were shut off and Plaintiffs realized they could not dial out.  MSUMF 35.

CNT's efforts to peacefully neutralize the mock hostage taker lasted several hours.  MSUMF No. 37.  During that time, a member of SORT who acted as a "tactical liaison" to CNT

facilitated communications between SORT and CNT.  MSUMF No. 38.  SORT also helped CNT to execute certain negotiation-related tasks, such as delivering a throw phone to the mock hostage taker.  MSUMF No. 38.  Other than supporting CNT's efforts, SORT stood down.  MSUMF No. 39.  At 10:25 am, shortly after shots were fired inside the Administrative Building, SORT executed a tactical order[1] to enter and search the Administrative Building to locate and capture the hostage taker.  MSUMF No. 44, 45.  Once SORT had neutralized the hostage taker, some members of the team escorted hostages out of the building.  MSUMF 45.

After neutralizing the hostage taker and escorting the hostages, SORT had one final task to complete the hours-long major mock exercise: a secondary search of the building to ensure that there were no other threats and that all staff were safe and accounted for.  MSUMF No. 46.  When they discovered during their secondary search of the Business Office that Plaintiffs were locked inside the cashier's cage, MSUMF No. 47, Defendants Hall, Holcomb, Moore, Privett, Ross, and Weise, who were anxious to bring their week-long certification process to a close, lost their cool and threw BOP policy out the window.  At first, Plaintiffs stayed silent, because they believed that SORT was compromised and trying to lure them out of their safe haven, MSUMF No. 48, a response to the situation that was entirely consistent with BOP policy and Plaintiffs' training.  MSUMF 34.  Defendants had more than one reason to know exactly why Plaintiffs were staying silent—because BOP policy for hostage situations required staff to establish a safe haven and keep quiet *and* because Plaintiffs' colleague, Robert Solano, told Defendant Moore that the individuals in the cashier's cage were "all just playing the part."  MSUMF Nos. 14, 49.  Nevertheless,

---

[1] A tactical operations order is a written document that details SORT's proposed response to an emergency and authorizes that response upon a signature from the incident commander.  MSUMF No. 41.

Defendants, who expected obedience to their orders, grew frustrated. MSUMF No. 56.

When their demands for Plaintiffs to open the door proved ineffective, SORT turned to other means to try to convince Plaintiffs to open the door, including having non-SORT employees talk to Plaintiffs and threatening Plaintiffs. For example, SORT asked both Solano and Crespin to ask Plaintiffs to come out. MSUMF No. 52. However, these communications raised red flags for Plaintiffs, who knew that Crespin had been taken hostage at the beginning of the exercise and who had received an email from Solano at 10:29 am suggesting that he had been taken hostage. MSUMF Nos. 19, 50, 51, 53, 54. Indeed, these communications led Plaintiffs to believe that the mock exercise was still ongoing and that compromised SORT members were attempting to lure them out of their safe haven. MSUMF No. 55.

When Solano's and Crespin's attempts failed, Defendant Weise threatened to throw an explosive device called a flash strip under the cashier's cage door. MSUMF No. 57. At that point, Plaintiff Cordo broke Plaintiffs' silence and said that there were people inside. MSUMF No. 58. But because Plaintiffs continued to maintain their safe haven, Defendants grew increasingly frustrated. Defendants repeatedly demanded that Plaintiffs open the door, repeatedly threatened to shoot OC into the cashier's cage, and slammed their bodies into the cashier's cage door. MSUMF No. 59. Defendant Moore threatened multiple times to shoot OC spray into the cashier's cage, and Defendant Weise threatened to shoot OC spray, too. MSUMF No. 60.

While Defendants escalated the situation, Plaintiffs tried to de-escalate the situation and open a clear line of communication. Plaintiffs repeatedly shouted that it was against BOP policy to shoot OC spray at staff and a civilian contractor. MSUMF No. 77. They yelled that Plaintiff

8

Arroyo had asthma, Plaintiff Boehm was injured, and Plaintiff Miller was pregnant. MSUMF No. 78. Defendants ignored Plaintiffs' pleas and told Plaintiffs that they did not care who was inside the cashier's cage. MSUMF No. 79. Multiple times, Plaintiffs conveyed their concern that SORT was compromised and working with "SORT team member Lieutenant Fernandez." MSUMF No. 66. However, Defendants did not respond to those concerns. MSUMF No. 67. Plaintiffs also told Defendants that the phones in the cashier's cage had been shut off and requested that Defendants call Main Control to ask that Main Control turn their phones on and call them to confirm that SORT was not compromised. MSUMF 68. Rather than radioing into Main Control and passing Plaintiffs' request up the command chain to the incident commander Assistant Warden Billy Eischen, Defendants told Main Control that SORT had not had any communication with the individuals inside the cashier's cage. MSUMF No. 69. In short, despite many opportunities to de-escalate and negotiate, and despite the fact that Plaintiffs were eager to simply follow policy, Defendants refused any chance of an orderly resolution and, indeed, gave Plaintiffs even more reason to be scared.

Having received no reassurance that SORT was not compromised, Plaintiffs continued to maintain their safe haven, and Defendants grew more frustrated with their perceived lack of obedience. Throughout the time that they sheltered in the cashier's cage, Plaintiffs believed that the mock exercise was still underway, because Defendants never said "out of role" or that the exercise was over. MSUMF No. 65. Indeed, they were convinced that the exercise *must* still be underway, because they knew that it would be against BOP policy for Defendants to follow through with their threats to shoot OC. MSUMF No. 65.

Defendant Weise thrust a Halligan tool[2] through the slot in the cashier's window and pried open the steel shutters on the inside of the cashier's window.  MSUMF No. 62.  Webster began shouting, "Out of role!" and demanding that Defendants stop destroying government property. MSUMF No. 63.  At this point the exercise should have stopped—"out of role" is a safety phrase that any BOP staff member can use during a mock exercise in order to immediately end the exercise for safety reasons.  MSUMF No. 64.  But Defendants did not relent.

Later, one of the Defendants shot a projectile that Plaintiffs believe was a Simunition[3] round through the cashier's window.  MSUMF No. 70.  The projectile barely missed Cordo, Boehm, and Webster, and hit a wall inside the cashier's cage.  MSUMF No. 71.  Cordo tried to block the cashier's slot where Weise had pried the steel shutters open, but Defendants dismantled the wooden and cloth barriers that he tried to create.  MSUMF No. 72.  Defendants shot several more Simunition rounds and/or projectiles into the cashier's cage, and one hit Cordo's hand. MSUMF Nos. 73, 74.  Although Plaintiffs could not see who was shooting, Defendant Ross admitted in his deposition that he shot several Simunition rounds, MSUMF No. 75, and Plaintiff Cordo recovered the remnants of approximately ten Simunition rounds from inside the cashier's cage later that day, MSUMF No. 76.

Meanwhile, Defendants repeatedly threatened to deploy OC spray, and Plaintiffs repeatedly shouted that it was against BOP policy to shoot OC spray at staff and a civilian contractor.  MSUMF No. 77.  At some point, desperate to gain control over Plaintiffs, Defendants

---

[2] A Halligan tool, sometimes colloquially referred to as a "hooligan tool," is used by emergency and rescue personnel to effect forceful entries through doors and windows.

[3] A Simunition round is a type of non-lethal ammunition used for live-firing training exercises that replaces the normal metal bullet on a round of ammunition with a plastic bullet.

Hall and Moore left the Business Office and obtained an MK-9 canister of OC spray, which they brought back to the Business Office and delivered to Defendant Weise.  MSUMF No. 80. Defendant Privett, condoning the SORT Defendants' plan to use OC, left the Business Office to acquire a gas mask from a SORT member stationed in the lobby and then returned to the Business Office with the mask.  MSUMF No. 81.  Defendants Holcomb and Weise, the SORT Leader and Assistant Leader, condoned the plan to use OC, and both requested over the radio authorization to deploy OC spray and threatened to deploy OC spray on Plaintiffs.  MSUMF No. 82.  Although the Command Center responded to the request by telling Defendants to "stand by" and never provided the requested authorization, MSUMF Nos. 83, 84, Defendant Weise communicated to the Command Center that he was going to use OC, MSUMF No. 88, and Defendant Moore began counting down from ten.  MSUMF No. 89.  Before Moore finished the countdown, Defendant Weise sprayed two bursts of OC—one at the cashier's window and one underneath the cashier's cage door.  MSUMF No. 90.

When Plaintiffs—who felt the effects of the OC and were shouting, "Out of role"— attempted to escape the cashier's cage to seek refuge from the OC, Defendants Weise, Ross, and Hall pushed their way into the cashier's cage and yelled at Plaintiffs to get on the ground, which was impossible given the size of the room and amount of furniture and number of people inside. MSUMF Nos. 91–94.  Then, despite Plaintiffs' pleas that they were "out of role" and getting hurt, MSUMF No. 99, Defendants Ross, Weise, and Hall repeatedly assaulted Plaintiffs and their colleagues.  MSUMF No. 98.  Defendant Hall repeatedly punched and shoved Quintiliano, slamming Boehm, who was on crutches, into the metal safe behind her.  MSUMF No. 100. Defendant Weise punched Cordo, struck Arroyo, and skimmed Boehm's cheek when he tried to

punch her.  MSUMF No. 101.  Defendant Ross punched Plaintiffs Cordo and Arroyo.  MSUMF No. 102.  After Arroyo was punched, he shouted that there were injured staff in the room.  MSUMF No. 103.  Defendant Ross responded, "Oh yeah?," raised his MP5 submachine gun, and shot Plaintiff Arroyo in the chest at point-blank range with a Simunition round.  MSUMF No. 104.[4] Defendants continued to strike, punch, and shove Plaintiffs even after Ross shot Arroyo.  MSUMF No. 107.

As a result of Defendants' attack, Plaintiffs have suffered numerous physical and psychological injuries.  MSUMF No. 108.  Arroyo suffered a bleeding laceration, bruising, and muscle trauma where the Simunition round hit him on the chest.  MSUMF No. 106, 108.  Boehm suffered serious back injuries, had a severe allergic reaction to pain medications on the ambulance ride to the hospital that day, and has required and still requires numerous surgeries to repair the damage to and near her back.  MSUMF No. 108.  Miller was transported to the hospital because she was experiencing stomach cramps and her pregnancy was at risk.  MSUMF No. 108.  Cordo received medical attention for a severe reaction to the OC spray, which was deployed directly at him.  MSUMF No. 108.  And every one of the Plaintiffs has suffered from post-traumatic stress disorder and had trouble finding closure in the wake of Defendants' attack.  MSUMF No. 108.

## PROCEDURAL HISTORY

In spite of the egregiousness of Defendants' acts, on January 14, 2022, the United States certified (without explanation) that Defendants were acting within the scope of their employment when they committed these acts (ECF No. 59-1) and filed a Notice of Substitution of the United

---

[4] Defendant Ross and others claim that Arroyo grabbed Ross's gun and Ross shot him in response. *E.g.*, Ex. 13 at 38:14–20 (Ross Dep.).  This testimony is belied by Plaintiffs' declarations under oath.  *See* MSUMF No. 105.

States as Defendant on Plaintiffs' tort claims (ECF No. 59).  On February 1, 2022, Plaintiffs moved for limited discovery on the scope-of-employment issue and indicated that they would challenge the United States' Westfall Act certification (ECF No. 75).  On March 8, 2022, the Court granted Plaintiffs limited discovery.  Plaintiffs have taken one-hour depositions of each Defendant and a two-hour 30(b)(6) deposition of the BOP, and have obtained discovery on ten requests for production and eight interrogatories served on the BOP.

## STANDARD

Although typically the Court may grant summary judgment under Federal Rule of Civil Procedure 56 only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," when determining the propriety of a Westfall Act certification, the Court must "identify and resolve any disputed issues of fact regarding the employee's scope of employment."  *See Fowler v. United States*, 647 F.3d 1232, 1241 (10th Cir. 2011) (internal quotation marks omitted); *Melo v. Hafer*, 13 F.3d 736, 747 (3d Cir. 1994) (holding that, after discovery on scope of defendants' employment and an evidentiary hearing, "the district court [would] resolve all issues of fact or law relevant to that issue and . . . find that the defendant did or did not act within the scope of his or her employment"); *Jamison v. Wiley*, 14 F.3d 222, 236 (4th Cir. 1994) ("The federal courts of appeals have consistently recognized that a district court has the power to hold a limited evidentiary hearing to resolve factual disputes that bear on a scope-of-employment issue properly before it in a Westfall Act case."); *Brown v. Armstrong*, 949 F.2d 1007, 1012 (8th Cir. 1991) ("[C]hallenges to the Attorney General's certification must be resolved before trial, as soon after the motion for substitution as practicable,

even if an evidentiary hearing is needed to resolve relevant fact disputes."); *Garcia v. Reed*, 227 F. Supp. 2d 1183, 1188 (D.N.M. 2002) (same).

If, after resolving any genuine disputes of material fact, the Court finds that Plaintiffs are entitled to summary judgment as a matter of law, the United States' Westfall Act certification cannot stand, and the case then proceeds against Defendants. *See Melo*, 13 F.3d at 747–48.

## ARGUMENT

Defendants' attack on Plaintiffs was outside of their scope of employment. As such, the United States' certification under the Westfall Act that Defendants were acting within the scope of employment is improper and must be set aside.

For purposes of the Westfall Act, the scope of employment is "defined by the respondeat superior law of the state where the incident occurred." *Sandoval v. Martinez-Barnish*, No. 09-cv-02434-REB-MJW, 2010 WL 5811830, at *4 (D. Colo. Aug. 24, 2010) (quoting *Richman v. Staley*, 48 F.3d 1139, 1145 (10th Cir. 1995)). Under Colorado law, an employee acts within the scope of his employment if: (1) his "intent in committing the tortious act [is] to further the employer's business," *see, e.g., Moses v. Diocese of Colo.*, 863 P.2d 310, 329 n.27 (Colo. 1993); *see also Sandoval*, 2010 WL 5811830, at *4; and (2) he is doing work that is "assigned to him by his employer," "necessarily incidental to that work," or "customary in the employer's business," *see, e.g., Podboy v. Fraternal Ord. of Police, Denver Sheriff Lodge 27*, 94 P.3d 1226, 1230 (Colo. App. 2004) (citation omitted).

Defendants were not acting within the scope of their employment when they attacked Plaintiffs for several reasons. First, Defendants acted so egregiously and intentionally that this alone renders their conduct squarely outside the scope of their employment under Colorado

respondeat superior law.  Second, Defendants' actions fail Colorado's respondeat superior two-part test: Defendants did not act to further the BOP's business, nor were Defendants' actions assigned, necessarily incidental to, or customary in the BOP's business.  Indeed, Defendants' actions violate numerous BOP policies and are unrecognizable as the acts of a well-trained BOP crisis management team.

## I.   Defendants Acted Outside the Scope of Their Employment Because Their Acts Were Intentional and Outrageous

The sheer egregiousness of Defendants' conduct requires a finding that they acted outside the scope of their employment.  When an employee's conduct is "'unprovoked, highly unusual, and quite outrageous,' this can in and of itself be sufficient to indicate that the conduct was personally motivated and outside of the scope of employment." *See Jordan v. W. Distrib. Co.*, 135 F. App'x 582, 585 (4th Cir. 2005) (quoting *Prosser and Keeton on the Law of Torts § 70*, at 506 (5th ed. 1984)); *see also* Restatement (Second) of Agency § 229 cmt. B ("Although an act is a means of accomplishing an authorized result, it may be done in so outrageous or whimsical a manner that it is not within the scope of employment.").  Likewise, under Colorado law, an intentional tort—let alone an outrageous and violent attack on coworkers—is "almost invariably outside the scope of employment." *See Cannes v. Molalla Transp. Sys., Inc.*, 1831 P.2d 1316, 1321 (Colo. 1992) (quotation omitted); *State Farm Fire & Cas. Co., Inc. v. United States*, No. 06-cv-01135-WYD-MJW, 2008 WL 5083502, at *8 (D. Colo. Nov. 25, 2008) ("Intentional conduct is usually outside of the 'normal risks to be borne by the business in which the servant is employed.'"); *see also Moses*, 863 P.2d at 329 n.27.  The drafters of the Westfall Act, who understood these outer limits of respondeat superior law, intended that Westfall Act immunity would not extend to federal employees engaging in "egregious misconduct, rather than mere

negligence or poor judgment." *See* H.R. Rep. No. 100-700, at 5 (1988); *see also Legislation to Amend the Federal Tort Claims Act: Hearing on H.R. 4358, H.R. 3872, and H.R. 3083 Before the H. Comm. On the Judiciary*, 100th Cong. 79 (1988) (statement of Robert L. Willmore, Deputy Assistant Attorney General, Department of Justice, Civil Division).

Even assuming that Defendants entered the Business Office with the intent to complete their secondary search, ultimately, they enacted far too much unnecessary violence and created far too much unnecessary terror to be within the scope of their employment. Without *any* information suggesting that Plaintiffs presented a threat to *anyone*, and without any reason for urgency, *see* MSUMF Nos. 114–116, Defendants Hall and Moore went out of their way to check out a MK-9 canister of OC from Main Control, MSUMF No. 80. Defendant Privett, who was charged with *supervising* and *evaluating* SORT's response to the mock exercise, MSUMF No. 7, and who claims he was "just a passenger along for the ride" for purposes of the training exercise, Ex. 12 at 31:9–14, 39:6–7 (Privett Dep.), left his post to acquire a gas mask from the lobby knowing that the SORT Defendants "intended to use OC." MSUMF No. 81.

Defendant Privett also received a call from Regional Tactical Trainer Michael Harris after Harris, who was in the Command Center, heard the request to use OC, instructing Privett not to allow OC to be deployed, and Privett responded, "Okay," but did nothing. MSUMF Nos. 86, 87. Team Lead Defendant Holcomb requested permission from the Command Center to deploy OC, and, in doing so, encouraged his subordinates to use OC. MSUMF No. 82. Without acquiring any such permission, Assistant Team Lead Defendant Weise *informed* the Command Center that he was using OC and deployed two sprays of OC into the cashier's cage with the intent that Plaintiffs would feel the effects of the OC. MSUMF No. 88. Defendant Ross shot several Simunition rounds

into the cashier's cage, including one that hit Plaintiff Cordo's hand, and later shot a Simunition round at point-blank range at Plaintiff Arroyo's chest.  MSUMF Nos. 70–76.  The Office of the Inspector General confirmed that this conduct was outrageous when it "determined that inappropriate and dangerous events transpired" during the mock exercise and recommend that BOP suspend all SORT mock exercises.  MSUMF No. 120.  Moreover, Defendants' supervisors have testified that Defendants' conduct is indefensible.  MSUMF No. 120.

Given the egregiousness of Defendants' actions, the United States' Westfall Act Certification should be set aside.

## II. Defendants Acted Outside the Scope of Their Employment Because Their Intent Was Not to Further the BOP's Business

Defendants' attack on Plaintiffs fails the first prong of Colorado's respondeat superior test.  Defendants were not acting with the intent to further the BOP's business.  Rather, Defendants were acting out of frustration—a personal motive that did not further BOP's business.  Defendants' alternative explanations for their actions are simply not credible.

### A. Defendants Acted on Personal Frustration When They Attacked Plaintiffs

Defendants acted outside the scope of their employment because their intent was not "to further the[ir] employer's business."  *Moses*, 863 P.2d at 329 n.27.  Rather, Defendants acted on frustration that "had no real connection with [the BOP's] business and was purely personal," which precludes immunity under the Westfall Act.  *Packaging Corp. of Am. v. Roberts*, 455 P.2d 652, 655 (Colo. 1969); *see also Rydberg v. U.S. Postal Serv.*, No. 20-cv-03230-SK, 2021 WL 1851033, at *3 (N.D. Cal. Jan. 21, 2021) (finding Westfall Act certification improper where employee's harassing conduct arose from a personal dispute).

Even assuming that, when they first entered the Business Office, Defendants acted with the intent to clear any other hostages or threats in the mock scenario, they admitted in depositions that Plaintiffs' perceived disobedience frustrated them.  MSUMF No. 56.  It was the last day of a full week of SORT training and evaluations, and the secondary search was the very last task that they needed to complete for the certification process.  MSUMF No. 46.  They were ready to move on and saw the use of weapons, munitions, and force as the quickest way out.

Even without their admission, personal frustration is the only explanation that makes sense of Defendants' conduct.  If Defendants were acting with intent to further the BOP's business, they would not have abandoned efforts to resolve the situation verbally.  They would not have rushed to the use of force against coworkers—including obtaining OC spray and an extra gas mask, asking for permission to use OC spray, deploying OC spray *twice* into the cashier's cage, and shooting Simunition rounds at Plaintiffs—without any information suggesting that anyone inside the cashier's cage presented a threat.  MSUMF No. 114, 115.  They would not have told the Command Center the lie that they had not had contact with Plaintiffs.  MSUMF No. 69.  They would not have committed clear violations of BOP's use of force policies, which forbids the use of force when there is no threat to safety, and BOP's Standards of Employee Conduct.  MSUMF Nos. 113, 118. They would not have put Boehm, who was injured and on crutches, and Patch, who was a civilian contractor, in harm's way, let alone subject them to a long, brutal attack.  MSUMF No. 117.  And, certainly, after Plaintiffs opened the door and attempted to leave the cashier's cage—which was ostensibly what Defendants had been trying to achieve all along—they would not have charged into the room to assault them and *prevent* them from leaving.  MSUMF No. 93, 98.

If Defendants were acting with intent to further the BOP's business, they instead would have enlisted CNT for peaceful negotiations, in keeping with BOP policy, which requires CNT to attempt to peacefully resolve an emergency before SORT gets involved "[s]o nobody gets hurt." MSUMF No. 42, 43.  They would have asked staff who had *not* been compromised or taken hostage for purposes of the mock exercise to establish communication with Plaintiffs, requested that the Command Center restore Plaintiffs' phones and call Plaintiffs, and said "out of role" or heeded Plaintiffs' "out of role" pleas.  They would have slowed the situation down instead of accelerating it into something that was unrecognizable as the work of a crisis management team tasked with ensuring the safety of BOP's staff.  *See* MSUMF No. 116.

The Court should strike the United States' Westfall Act certification because, when Defendants acted in the heat of the moment and out of frustration, they abandoned any intent "to further the[ir] employer's business" and stepped outside of the scope of their employment.  *Moses*, 863 P.2d at 329 n.27; *see e.g., Majano v. United States*, 469 F.3d 138, 142 (D.C. Cir. 2006) (finding that Westfall Act certification was improper where employee's assault on coworker where employee's intent "at the moment the tort occurred" was not adjacent to her duties); *Rubin v. Yellow Cab Co.*, 507 N.E.2d 114, 116 (Ill. App. Ct. 1987) (affirming trial court's dismissal of respondeat superior claim where cab driver's "assault on plaintiff was clearly not an act undertaken to further Yellow Cab's business but rather one propelled singularly by anger and frustration"); *O'Brian v. Rutherford Cty. Bd. of Educ.*, No. M2017-00527-COA-R3-CV, 2018 WL 3640992, at *3 (Tenn. Ct. App. July 31, 2018) (affirming trial court's determination that junior ROTC instructor acted outside scope of employment when he pulled stool out from under student where he acted "'in the heat of the moment' and out of 'frustration'").

**B.  Defendants' Excuses Are Post Hoc Attempts to Rationalize Egregious Behavior**

Defendants offer two alternative explanations for their attack on Plaintiffs, neither of which is credible.  Some Defendants, including Moore and Ross, testified that they believed that someone inside the cashier's cage was role playing as a second mock hostage taker for purposes of the major mock exercise.  *See* Ex. 10 at 41:9–42:3, 55:7–15 (Moore Dep.); Ex. 13 at 57:1–12 (Ross Dep.). Other Defendants, including Privett, Holcomb, and Weise, testified that they believed that there was a *real* hostage taker or threat inside the cashier's cage.  *See* Ex. 12 at 36:11–24, 39:15–21, 45:14–47:5, 50:4–12, 52:11–17 (Privett Dep.); Ex. 9 at 41:17–42:5, 43:22–44:13 (Holcomb Dep.); Ex. 14 at 56:4–12 (Weise Dep.).  Numerous contradictions render both excuses untenable.

Defendants Moore and Ross's theory that there was a second mock hostage taker inside the cashier's cage is contradicted first and foremost by the fact that the Command Center specifically told SORT over their radios that the individuals inside the cashier's cage were *not* part of the mock scenario.  MSUMF No. 61.  Even absent that communication, it would have been clear to Defendants that there was no mock hostage taker inside the cashier's cage when they saw that no one inside the cashier's cage was wearing personal protective equipment, which role players were required to wear under BOP policy and the Safety Message/Plan for the major mock exercise.  MSUMF Nos. 96, 97.  Defendants may have seen that Plaintiffs were not wearing PPE through the opening in the cashier's window, but they certainly saw it when they entered the cashier's cage, before they proceeded to punch, shove, and shoot at Plaintiffs.  MSUMF Nos. 93, 95, 98.  Finally, if Defendants sincerely believed that the situation in the cashier's cage was a continuation of the mock exercise, they would have followed the very same policies they had just followed during the mock exercise, including enlisting CNT for peaceful negotiations and getting

a tactical order authorizing the use of weapons and munitions.  MSUMF Nos. 10, 24, 37–40, 42–44.

Defendants Holcomb, Privett, and Weise's theory fares no better, not least of all because, in a real emergency, too, Defendants would have applied the policies and practices that they had just rehearsed in the mock exercise, including enlisting CNT and getting a tactical order authorizing the use of force.  MSUMF Nos. 13, 40.  After all, the whole point of the mock exercise was to simulate a realistic—and sound—response to a real emergency situation.  MSUMF No. 13. Defendants also would have communicated to the Command Center that they perceived a real emergency, which they never did.  MSUMF No. 109.  Furthermore, Defendants had received clear communications contradicting their purported belief: Solano told Defendant Moore well before Defendants had used any force against Plaintiffs that Plaintiffs were "just playing the part," MSUMF No. 49, and Plaintiffs repeatedly expressed a concern that SORT was compromised for purposes of the mock exercise, MSUMF No. 66.  Finally, Defendants have offered no credible reason that they believed there was a real threat inside the cashier's cage.  The only justifications that they offered in depositions were (1) that the individuals inside the cashier's cage refused to communicate with SORT, (2) that they had barricaded themselves inside the cashier's cage, and

(3) that the situation was "intense."[5, 6]  *See* Ex. 12 at 46:1–47:5 (Privett Dep.); Ex. 9 at 41:22–42:3, 42:18–43:21 (Holcomb Dep.).   However, both Plaintiffs' initial silence and the barricade they constructed were consistent with the response required of staff in a hostage situation—they were *required* to establish and maintain a safe haven and keep quiet until the situation was neutralized. MSUMF No. 14.

The fact that Defendants have two conflicting stories to justify their actions is also telling. Defendants were all in the same room, responding to the same situation, and in constant communication with each other.  It defies logic that a troop of tactical officers moving in tandem and coordinating their actions could have been on such different pages in the moment, but it is not

---

[5] Defendant Ross claims that he had reason to believe that the staff members inside the cashier's cage were armed because he thought he saw the barrel of a pistol pointing out through the cashier's window at him.  *See* Ex. 13 at 20:17–21:15 (Ross Dep.).  However, this testimony is simply not credible.  Although Defendant Ross testified that he "think[s]" he told other SORT members that he observed a weapon inside the cashier's cage, *none* of the incident memoranda prepared by Defendants and other SORT members and BOP staff mention this detail—which is a crucial and memorable detail that one would expect an officer to include in his memorandum justifying the use of force.  *See* Ex. 16 (Staff Incident Mems.).  Furthermore, none of the other depositions conducted in this matter corroborated that testimony.  Indeed, several Defendants testified that they had *no* information suggesting that the staff inside the cashier's cage were armed or posed a threat to anyone else.  MSUMF Nos. 114, 115.

[6] Defendant Privett alludes to the presence of a contractor in the cashier's cage as a reason to believe that there was a real hostage situation.  *See* Ex. 12 at 36:11–24.  He suggests that Patch could have been a hostage taker holding the BOP employees in the cashier's cage hostage.  This is hard to believe when the record is clear that Patch was loudly sobbing and hysterically crying in the corner of the room.  *See* Ex. 16 at USA00528, USA00529 (Boehm Mem.); Ex. 1 ¶ 29 (Boehm Decl.).  In any event, Defendant Privett's testimony that the reason Patch's presence raised a red flag and a reason to "err on the side of caution" is that "I don't know anything about a contractor at all," *see id.*, reveals just how unjustified Defendants' resort to force and violence was.  In compliance with BOP policy for emergencies (and mock emergencies), Plaintiffs had reported their whereabouts and that they were not compromised to Main Control, MSUMF No. 28, and Defendants could have learned everything they needed to know about Patch if they had only so much as *attempted* to de-escalate the situation.

difficult to imagine that each of them is grasping at straws to rationalize his actions in the context of this lawsuit.

### III.   Defendants Acted Outside the Scope of Their Employment Because Their Actions Were Not Assigned, Necessarily Incidental, or Customary

Defendants' attack on Plaintiffs fails the second prong of Colorado's respondeat superior test, because their overt disobedience of direct orders not to deploy OC spray, rejection of compulsory procedures for obtaining authorization to use any force, and disregard for fundamental safety policies and procedures cannot be characterized as "assigned" work, "necessarily incidental" to assigned work, or "customary" in the BOP's business. *Podboy*, 94 P.3d at 1230. Rather, because Defendants' attack was "unprovoked," "meant to harm," not justified by any real danger, and motivated by an intent to punish Plaintiff rather than further BOP's interests, it was outside the scope of Defendants' employment as a matter of law. *See Maldonado Pinedo v. United States*, 814 F. App'x 338, 350–52 (10th Cir. 2020).

### A.   Defendants' Attack on Plaintiffs Was Not "Assigned" Work or "Necessarily Incidental" to Assigned Work

Defendants' violent outlash against their coworkers was not assigned work or necessarily incidental to assigned work. In emergency situations, Defendants' assignment is to seek to de-escalate the situation if at all possible. *See* MSUMF No. 42, 43. And in their secondary search of the administrative building, Defendants' assignment was to ensure that all staff were accounted for *and safe*. *See* MSUMF No. 46. In conducting those secondary searches, Defendants cast aside their assignments and did the exact opposite of what they were supposed to do.

After precisely following BOP policies and procedures for the first nearly three hours of the major mock exercise—supporting CNT's de-escalation efforts, awaiting activation of SORT

by a warden, securing tactical orders authorizing responses to the mock hostage taker, and approaching the capture of the hostage taker in accordance with those tactical orders—Defendants failed to de-escalate to ensure the safety of staff.  Instead, after learning that there were staff members in the cashier's cage, Defendants ignored Plaintiffs' verbal attempts to mediate.  For example, although Plaintiffs communicated multiple times that they were concerned that SORT was "compromised" and working with former SORT member Lieutenant Fernandez, Defendants ignored them.   MSUMF Nos. 66, 67.   Although Defendants enlisted non-SORT staff to communicate with Plaintiffs, all of those staff had been compromised and taken hostage and were obviously poor choices for establishing communication.  MSUMF Nos. 52–55.  Defendants ignored Plaintiffs' pleas for Defendants to ask the Command Center to turn on Plaintiffs' phones and call Plaintiffs to confirm that Defendants were not compromised, going so far as to misrepresent to the Command Center that they had had no contact with Plaintiffs.  MSUMF Nos. 68, 69.  Defendants also declined to seek any form of support from CNT.  MSUMF Nos. 110. Rather, Defendants resorted to intentionally using force against and inflicting harm on Plaintiffs. Then, when Plaintiffs ultimately opened the door to the cashier's cage and attempted to leave, instead of welcoming Plaintiffs' long-awaited acquiescence, Defendants shoved them back into the cashier's cage and repeatedly assaulted them.  *See* MSUMF Nos. 93, 98.

Indeed, Defendants did the exact opposite of what Acting Warden Billy Eischen, who was the incident commander for the mock exercise, explicitly ordered.  When Defendant Holcomb requested authorization over the radio to deploy OC spray, the Command Center instructed SORT to "stand by."  MSUMF No. 83.  Without any subsequent authorization to use OC or any other weapons or munitions, MSUMF No. 84, Defendants Moore and Hall left the cashier's cage and

retrieved an MK-9 canister of OC, Defendant Privett left the cashier's cage to obtain a gas mask so that he could withstand the use of OC without impact and ignored Regional Tactical Trainer Harris's admonition not to allow the use of OC, Defendant Weise sprayed two bursts of OC into the cashier's cage with the intent that Plaintiffs would feel its effects, and Defendant Ross shot rounds and rounds of Simunition bullets into the cashier's cage and shot Arroyo point-blank in the chest. MSUMF Nos. 70–76, 80, 81, 86, 90, 104. Under Colorado law, this kind of defiance is squarely outside the scope of one's employment. *See Destefano v. Grabrian*, 763 P.2d 275, 287 (Colo. 1988) (holding that employee's conduct was outside scope of employment where it was "contrary to the instructions" of employer).

Defendants also defied the tactical orders in place and failed to generate a tactical order authorizing *any* use of force against Plaintiffs. MSUMF No. 85. As Warden Eischen testified, SORT cannot "take any action" without a tactical order approved by a warden authorizing that action. MSUMF No. 40. Only three tactical orders were generated in the course of the mock training exercise: a tactical order for the delivery of a throw phone to the mock hostage taker, a tactical order for the delivery of water to the mock hostage taker, and a tactical order for breach of the administrative building and neutralization of the mock hostage taker. MSUMF No. 85. Even in those tactical orders, SORT was *not* authorized to use or even carry *any* OC. MSUMF No. 85. And there was *no* tactical order authorizing the use of *any* munitions, weapons, or force on Plaintiffs or their colleagues in the cashier's cage. MSUMF No. 85.

Even if Defendants had overlooked the need for authorization and a tactical order, which they did not, they could not have overlooked the countless BOP policy violations that they were committing. After all, BOP policy was front and center during the major mock exercise, the central

purpose of which was for SORT to demonstrate proficiency in applying policy to a realistic emergency scenario.  MSUMF No. 13.  Instead, Defendants committed numerous policy violations that reveal not an accidental deviation from their task but a willful departure from the very essence of the jobs that the BOP entrusts them with.  Defendants violated BOP's Standards of Employee Conduct by "us[ing] physical violence, threats, [and] intimidation toward fellow employees" and by using OC spray and Simunition rounds absent any information suggesting a threat to anyone's safety. MSUMF Nos. 113, 118.  Defendants violated policy when they failed to open a line of communication between Plaintiffs and CNT.  MSUMF Nos. 42, 43, 110.  Defendants violated policy, including the Safety Message/Plan for the mock exercise, when they dismissed Plaintiffs' repeated cries of "out of role," which should have immediately ended the exercise.  MSUMF No. 64, 65.  Defendants violated policy when they used munitions and force against Plaintiff Boehm, who was injured, on crutches, and on Temporary Alternative Duty, and therefore was not permitted to be dragged into a mock exercise.  MSUMF No. 117.  Defendants violated policy when they used munitions and force against and inflicted harm on civilian contractor Jessie Patch, as contractors are not to be included in mock exercises and are required to be removed from and afforded utmost protection in emergency situations. MSUMF No. 117.  And Defendants continued to violate policy after Plaintiffs repeatedly told them that there were injured staff and a contractor inside the cashier's cage.  MSUMF No. 77, 78, 103.

Because a federal prison complex can be an unpredictable and dangerous environment, the BOP carefully constrains the conduct of its employees through encyclopedic policies and procedures and structured chains of command to ensure that employees do not stray from their work in ways that create unnecessary safety risks.  MSUMF No. 111.  BOP's crisis management

teams in particular are required to operate within precise boundaries and meet exacting standards because of the risks inherent in responding to the prison's most emergent and most unpredictable situations.  MSUMF No. 111.  To ensure that they stay within those boundaries and meet those standards, SORT members are rigorously trained and evaluated on their ability to apply BOP policy in emergencies.  MSUMF No. 112.

Defendants, however, departed so far from BOP's prescribed systems that the end result— the infliction of serious physical and psychological injuries on coworkers who presented no threat to anyone and were simply and earnestly trying to do what they were supposed to do—is unrecognizable as the work of BOP crisis management tactical operators.   Under these circumstances, Defendants' actions are outside the scope of their employment.  *See State Farm & Cas. Co., Inc.*, 2008 WL 5083502, at *8 (holding that employee acted outside scope of employment because she "contravened the established policy" of her employer and explaining that "[a]n employee's violation of a policy established by the employer is evidence that the requirements for vicarious liability have not been met."); *Duran v. Flagstar Corp.*, 17 F. Supp. 2d 1195, 1200 (D. Colo. 1998) (holding that employee's alleged conduct was "explicitly forbidden" by the employer and therefore "could not have been committed with in the course and scope of [his] employment"); *Moses*, 863 P.2d at 330 (holding that employee's conduct was outside scope of employment where it was "contrary to the principles" held by employer); *see also Rydberg*, 2021 WL 1851033, at *4 (finding that Westfall Act certification was improper where employee "departed from his duties significantly").

**B. Defendants Wholly Abandoned the Behavior That is "Customary" in BOP's Business**

In this peculiar situation, we have the benefit of the immediate juxtaposition of SORT's customary response to an uncertain and potentially threatening situation, which they modeled in their dealings with the mock hostage taker, and SORT's uncustomary response to a frustrating but non-threatening situation involving coworkers with a clear intent to simply comply with policy. The contrast between those two responses—executed mere minutes apart—is striking.

The overwhelming response by leaders at BOP to Defendants' abandonment of SORT's usual tactics has been shock and disgust.  On June 21, 2019—the day after the disastrous mock exercise, BOP removed Defendant Weise from SORT "on the basis of the incident and the fact that the utilization of OC was not authorized, nor was it indicated on the tactical order."  MSUMF No. 119.  A few days later, Defendant Myers, FCC Florence's Emergency Preparedness Officer, warned SORT members to "NOT make hasty decisions without understanding the entirety of a situation."  MSUMF No. 120.

The day of the exercise, when the Command Center heard Defendant Holcomb's request for authorization to deploy OC spray, the request was so far afield of custom that the Command Center's occupants were stunned.  According to Defendant Myers, "there was a big question mark in the room."  MSUMF No. 120.  In addition to Warden Eischen's and Regional Tactical Trainer Harris's immediate reactions that the use of munitions on the staff inside the cashier's cage would be inappropriate, CNT Team Leader Aimee Tuttoilmondo, who was also in the Command Center, recalls that she "spoke up loudly and said, 'No, absolutely not, those are staff in that cashier cage.'" MSUMF No. 120.  And Assistant HR Manager Jean Edwards staff expressed a great deal of

concern in the aftermath of the attack, too, regarding Defendants' decision to put a contractor in harm's way.  *See, e.g.*, MSUMF No. 120.

USP Florence Warden Andre Stancil has testified under oath that, before this incident, the use of OC spray and Simunition rounds on staff members had "never occurred in a mock drill— in any way" and described his reaction:

> Staff was seemingly upset, and from what they were, you know, relaying to me, I, too, was upset because I had been told, like I said, of the use of OC spray on staff, use OC spray on other staff, which is against policy. We're not even allowed to do that in training for how to use OC. We're not even allowed to spray each other at those times. I was told that a staff member had been shot in the chest with a — with a less lethal round, which should never occur. That is not part of the training manual. We don't shoot staff with — with less lethal rounds. We don't — we don't use force against staff unless it's — unless it's a life threatening situation, and a mock scenario is not a life threatening situation.

MSUMF No. 120.

After and in direct response to Defendants' shocking attack on Plaintiffs, OIG and BOP's North Central Regional Office recognized a need for additional oversight of and training for SORT.  In a report published in June 2020, OIG recommended that BOP suspend all mock exercises until it developed "comprehensive guidelines governing mock exercise" based on its finding that:

> [I]nappropriate and dangerous events transpired during the [mock exercise].  Most seriously, . . . SORT members deployed real OC spray rather than inert OC spray during a training exercise, allegedly without proper authorization; and SORT members used force, including firing a simunition round, against staff members who were allegedly yelling to the SORT that they were "out of role" and physically vulnerable.

MSUMF No. 120.  BOP's North Central Regional Office, observing that "incidents occurring during emergency team operations . . . have placed our staff in unnecessary jeopardy resulting in

injuries," implemented additional procedures to encourage oversight of mock exercise planning. MSUMF No. 120.

The only logical conclusion to draw from BOP staff's overwhelming reaction to Defendants' conduct is that Defendants committed acts that are far from customary in the BOP's business.

## CONCLUSION

In light of the foregoing arguments, Plaintiffs request that the Court grant summary judgment in their favor and strike the United States' Westfall Act certification and Notice of Substitution.

Dated: June 21, 2022                                Respectfully submitted,

By:    */s/ Kathleen K. Custer*
       Ed Aro
       Kathleen K. Custer
       Rachel Ryan
       Genevieve Geiger
       Kristen Proe Kendall
       Arnold & Porter Kaye Scholer LLP
       1144 Fifteenth Street, Suite 3100
       Denver, CO 80202-2569
       (303) 863-1000
       Ed.Aro@arnoldporter.com
       Katie.Custer@arnoldporter.com
       Rachel.Ryan@arnoldporter.com
       Genevieve.Geiger@arnoldporter.com
       Kristen.Kendall@arnoldporter.com
       *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that, on June 21, 2022, I served the foregoing **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT TO SET ASIDE THE UNITED STATES' WESTFALL ACT CERTIFICATION AND NOTICE OF SUBSTITUTION** via ECF on all counsel of record authorized to receive such notices.

                 */s/ Noemi Sanchez*