IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:21-cv-01687-CNS-MDB

JOSE ARROYO,
HEATHER BOEHM,
SAMUEL CORDO, and
AMBER MILLER,

    Plaintiffs,

v.

ALEXANDER HALL,
TIMOTHY HOLCOMB,
DEREK MYERS,
JOSHUA MOORE,
ANDREW PRIVETT,
DUSTIN ROSS,
CHAD WEISE, and
UNITED STATES OF AMERICA,

    Defendants.

## ORDER

Before the Court is Defendant Derek Myers' motion to dismiss. ECF No. 261. For the following reasons, the motion to dismiss is GRANTED.

1

# I. BACKGROUND[1]

## A. Factual Background

On June 20, 2019, the U.S. Penitentiary Florence (USP Florence) held a training exercise involving a mock hostage situation for its Special Operations Response Team (SORT). ECF No. 1, ¶¶ 20–21. SORT is composed of armed officers who are responsible for responding to prison disturbances. *Id.*, ¶ 21. To maintain its BOP certification, SORT frequently runs mock training exercises. *Id.* All BOP employees are required to participate in these exercises. *Id.*

Defendants Fernandez, Hall, Holcomb, Moore, Ross, and Weise were all members of SORT at the Federal Correctional Complex Florence (FCC Florence), with Holcomb acting as the team lead. *Id.*, ¶ 22. Defendant Myers was responsible for ensuring that FCC Florence's SORT received the trainings to retain its certification. *Id.* Defendants Privett and Harris were officers from other federal prison complexes who were visiting FCC Florence as regional Tactical Trainers to facilitate the training. *Id.* That morning, plaintiffs were all working in the business office. *Id.*, ¶ 23. Plaintiff Boehm was on crutches after suffering complications from a recent surgery and had physicians' orders not to respond to emergencies, run, or lift objects over 25 pounds. *Id.*, ¶ 25, 34. Plaintiff Miller was pregnant with an at-risk pregnancy and was also observing physical restrictions imposed by her doctor. *Id.* Five other employees and one civil contractor, Jessie Patch, were also working in the business office. *Id.*, ¶ 26.

---

[1] The following facts are drawn from Plaintiff's complaint. ECF No. 1. For purposes of this motion, the Court accepts as true, and views in the light most favorable to Plaintiff, all factual allegations contained in the complaint. *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

2

At 8:00 a.m., the employees in the business office heard a "man-down" alarm in the lobby of the administrative building, which indicated a possible assault on staff. *Id.*, ¶ 28. An officer in the complex's main control center (Main Control) announced to all employees' radios that Defendant Fernandez was the employee who needed assistance. *Id.* Main Control facilitates official communications and, in the event of an emergency or training exercise, is staffed with supervisors with authority to dictate actions taken by SORT. *Id.*, ¶ 29. Defendants Eischen, Harris, and Myers were among the staff listening to radio traffic throughout the mock exercise. *Id.*

BOP policy requires all employees who are able to respond to a man-down call to immediately respond. *Id.* Pursuant to that policy, three employees in the business office (Crespin, Aperyan, and Dunderman) reported to the lobby. *Id.* Webster and Plaintiff Miller followed them, and Webster told Plaintiff Miller that hostages were being taken. *Id.* Plaintiff Miller then realized that SORT was conducting a mock hostage exercise. *Id.*, ¶ 30. Webster and Plaintiff Miller returned to the business office and told Plaintiffs Arroyo, Boehm, and Cordo that a hostage exercise was underway and that the other Business Office employees may have been taken as hostages. *Id.* Plaintiffs Miller and Cordo closed the door to the Business Office and locked themselves inside, pursuant to BOP policy requiring employees to establish a safe haven in a hostage situation until an "all clear" announcement. *Id.*, ¶¶ 31, 32.

Around 8:25 a.m., Defendant Myers and another BOP staff member began "bashing" on the Business Office door. *Id.*, ¶ 33. Believing they were trying to breach the business office, Plaintiffs, along with Webster, Quintiliano, and Patch, retreated to the

3

cashier's cage and locked the door and the roll-up steel shutters over the windows. *Id.* The cashier's cage is eight feet long by five feet wide, containing a large L-shaped desk with a hutch, a large safe, a double filing cabinet, two single filing cabinets, and two desk chairs. *Id.*, ¶ 35. Webster and Quintiliano sat on filing cabinets, Plaintiff Miller and Patch sat on the safe, and Plaintiff Arroyo sat on the floor in front of the door. *Id.*, ¶ 35. The seven individuals in the cashier's cage could hardly move after establishing their seating arrangement. *Id.* Webster called Main Control to report that Plaintiffs, Webster, Quintiliano, and Patch were sheltering in place in the cashier's cage. *Id.*, ¶ 36.

Minutes later, Main Control announced that Defendant Fernandez had been compromised for purposes of the drill. *Id.*, ¶ 37. Dunderman, a Business Office employee, then requested that Plaintiffs open the Business Office so she could escape. *Id.*, ¶ 38. Plaintiffs refused because it would be a violation of BOP policy to compromise their safe haven. *Id.* They also believed that Dunderman was taken hostage and was trying to lure them out. *Id.*

Shortly after, Plaintiffs realized that their internal and external telephone lines had been shut off. *Id.*, ¶ 39. Plaintiffs emailed with Solano, whose office was outside the cashier's cage, to ask if they were permitted to use the restroom. *Id.*, ¶¶ 40–41. Solano asked Defendant Myers, who said that they could use the restrooms but that the area beyond was roped off for the exercise. *Id.*, ¶ 41. However, minutes later, Solano emailed Plaintiff Cordo saying that Solano had been taken hostage. *Id.* Plaintiffs concluded that the hostage takers were again using hostages to attempt to lure them out of the cashier's cage. *Id.*

4

Around 10:00 a.m., Plaintiffs heard keys outside the Business Office. *Id.*, ¶ 42. They believed that SORT had access to Business Office keys because they had taken Business Office employees hostage. *Id.* In response, Arroyo, Cordo, and Quintiliano barricaded the door shut with two filing cabinets and a cooler. *Id.* Around 11:00 a.m., Plaintiffs heard noises in the Business Office and realized that SORT officers were there. *Id.*, ¶ 43. Plaintiffs turned off the lights and the fan in the cashier's closet and stayed silent. *Id.* Solano told Plaintiffs to come out. *Id.*, ¶ 44. However, Solano had been taken hostage previously, so Plaintiffs believed that the hostage takers were using Solano to lure them out of their safe haven. *Id.* Defendants Weise and Holcomb called Plaintiff Cordo's name and said, "Hey, we got your buddy out here," and "Hey guys, come on out." *Id.*, ¶ 45. Plaintiffs remained silent. *Id.*, ¶ 46.

Defendants continued to tell Plaintiffs to come out of the cage. *Id.* Defendant Weise threatened to throw a flash strip, an explosive device, under the door if Plaintiffs did not come out. *Id.* Plaintiff Cordo shouted back, "No, we are in here." *Id.* Defendants Weise and Holcomb continued to shout, and Defendant Moore threatened to shoot OC spray into the cashier's cage. *Id.*, ¶ 47.

It is against BOP policy to shoot OC spray at fellow BOP staff. *Id.* BOP policy also requires SORT officers to declare themselves "out of role" and to identify themselves in order to signal the end of a training exercise. *Id.*, ¶ 48. Defendants did not do so. *Id.* There had also been no "all clear" announcement. *Id.* Thus, Plaintiffs did not open the door. *Id.*

Defendants began to slam their bodies into the door, and one officer shoved a crowbar through the mailbox slot in the cashier's window to pry open the steel shutters.

5

*Id.*, ¶¶ 49, 50. Webster yelled out that Defendants were destroying government property, but they continued to pry the window open until it was six to eight inches open. *Id.*, ¶ 51. Then, without warning or provocation, Defendants shot a projectile, which Plaintiffs believe was a pepper ball or sting ball, through the opening. *Id.*, ¶ 52. Plaintiffs grew more afraid; Plaintiff Miller began screaming for the officers to stop, that they were out of role, and that they were going to harm someone. *Id.*, ¶ 53. Patch was sobbing. *Id.*

Defendant Moore threatened to shoot OC spray into the room. *Id.*, ¶ 54. Plaintiff Boehm responded that they could not use OC spray because it was against policy to spray BOP employees during a mock exercise, let alone with a civilian contractor in the room. *Id.* Defendants screamed back that they did not care who was inside, and again threatened to shoot OC spray. *Id.*, ¶ 55. Plaintiffs were afraid that Defendants were trying to lure them into violating BOP policy, and also terrified by their hostility and threats. *Id.*, ¶ 56. Plaintiff Arroyo yelled that Plaintiffs were not coming out. *Id.*

Defendant Weise recognized Plaintiff Arroyo's voice, asked if Arroyo was inside, and said, "you know who the FUCK I am! Get out of the room." *Id.*, ¶ 57. Defendants Moore and Holcombe continued threatening to use OC spray and ramming the door. *Id.*, ¶ 58. Plaintiffs, attempting to de-escalate the situation, suggested that the officers ask Main Control to turn their phones on and verify that the officers were not compromised. *Id.*, ¶ 60. Defendants falsely claimed that they had called Plaintiffs and that Plaintiffs did not answer. *Id.*, ¶ 61. One Defendant announced on the radio that they had not had any contact with people inside the cashier's cage. *Id.*, ¶ 62. Plaintiff Miller shouted that this was a lie. *Id.*

Quintiliano yelled that he had asthma and that they could not use OC spray on him. *Id.*, ¶ 63. Plaintiff Boehm yelled, "You need to stop! We have contract staff and staff with medical issues in here!" *Id.* Plaintiff Miller yelled that she was pregnant and that the officers were taking the exercise too far. *Id.*

Plaintiff Cordo, peering through the gap in the cashier's window, asked Defendants Weise and Holcomb how Plaintiffs could know whether the officers were compromised. *Id.*, ¶ 64. They did not respond. *Id.*, ¶ 65. Defendant Moore again threatened to shoot OC spray into the room. *Id.* Defendant Weise then shot OC spray at Plaintiff Cordo, using a large MK-9 aerosol bottle intended for crowd control. *Id.*, ¶ 66. One or more of the Defendants then began shooting nine-millimeter simunition rounds and pepper balls into the room. *Id.*, ¶ 67. One simunition round hit Plaintiff Cordo's hand. *Id.* MK-9 aerosol bottles, simunition rounds, and pepper balls must be checked out with permission from a warden. *Id.*

Plaintiffs smelled OC and repeatedly yelled "out of role." *Id.*, ¶¶ 68–69. Plaintiff Cordo announced that they were coming out and began removing the barricade. *Id.*, ¶ 69. Defendants Weise, Hall, and Ross, who were armed and wearing tactical gear, kicked the door open, yelled for Plaintiffs to get on the ground, and pointed guns at Arroyo. *Id.*, ¶ 70. Defendant Ross punched Plaintiff Cordo in the face. *Id.*, ¶ 72. Defendant Hall punched Quintiliano in the face and shoved him into Plaintiff Boehm, knocking her off her crutches and causing her to pin Plaintiff Miller's leg into the safe. *Id.*, ¶ 73. Defendant Hall repeatedly punched Quintiliano and shoved Plaintiff Boehm into the safe. *Id.*, ¶ 73. Plaintiff Arroyo shouted that there were injured staff in the room, to which Defendant Ross

7

responded, "Oh, yeah?" and shot Plaintiff Arroyo in the chest with a simunition round from a nine-millimeter pistol. *Id.*, ¶¶ 74–75. The bullet burned through Plaintiff Arroyo's shirt and left a bruise on his chest. *Id.*, ¶ 75. Plaintiffs continued to scream "out of role." *Id.*, ¶ 76. Plaintiff Miller, whose leg was still pinned between Defendants and the safe, was crying in pain. *Id.*, ¶ 77. Plaintiff Boehm screamed that Defendant Hall was hurting her and she was on crutches, but he did not stop, so she began continuously screaming. *Id.*, ¶ 78. Defendants then left the cashier's cage. *Id.*, ¶ 80.

Once outside, two SORT officers yelled at Plaintiff Arroyo, and Defendant Moore screamed at Plaintiff Boehm to exit the room. *Id.*, ¶¶ 80–81. Defendant Holcomb yelled at Defendant Moore to "drag her ass out!" *Id.*, ¶ 81. Plaintiff Boehm responded that she was on crutches and there were papers and objects all over the floor. *Id.* Defendant Moore kicked a pathway clear and Plaintiff Boehm left the cashier's cage. *Id.*, ¶ 81.

Plaintiff Miller was unable to get off of the safe because of her injuries, and asked Webster for help. *Id.*, ¶ 82. Defendant Moore lifted her off the safe. *Id.* Upon exiting the cashier's cage, Plaintiffs saw other SORT officers in the common area of the Business Office, who had done nothing to stop the attack. *Id.*, ¶ 83. When Plaintiffs asked Defendants why they had escalated the situation, they responded that Plaintiffs "should have just opened the door." *Id.*, ¶ 86.

Defendant Myers, who was standing in the Business Office, called the Command Center on his radio and relayed: "End of mock, end of mock, we have a real situation up here." *Id.*, ¶ 85. When Plaintiff Boehm asked Defendant Myers why he let the training exercise escalate into violence against BOP staff members, he shouted that it was not

his team and that they would "figure it out." *Id.* Defendant Myers, as the Emergency Preparedness Officer, was responsible for planning and facilitating the mock training exercise. *Id.*, ¶ 89. He had briefed Defendant Fernandez on the training exercise beforehand. *Id.*

### B. Procedural Background

Plaintiffs filed their complaint on June 18, 2021. ECF No. 1. All Defendants then filed motions to dismiss, after which Plaintiffs voluntarily dismissed the two state law claims pleaded against Defendant Myers. ECF Nos. 151 (order), 149 (motion for voluntary dismissal). The United States then substituted itself as Defendant for Counts II and III, via a Westfall Act certification, on the basis that the individual Defendants were acting within their scope of employment. ECF No. 59. The government then moved to dismiss those two claims. ECF No. 60. After conducting limited discovery on the issue, Plaintiffs filed a motion for summary judgment to set aside the United States' Westfall Act certification. ECF No. 169. The Court granted the motion, rejected the United States' Westfall certification, and struck the substitution of the United States for the individual Defendants, finding that the individual Defendants were not acting within the scope of their employment. ECF No. 211. Defendants appealed. ECF Nos. 219–21. The Court denied Defendants' pending motions to dismiss without prejudice, allowing Defendants to refile in light of the Tenth Circuit's ruling on the appeals. ECF No. 243. Defendant Myers appealed that denial. ECF No. 244. The Tenth Circuit dismissed the appeal. ECF Nos. 256, 257. The Tenth Circuit then affirmed the Court's Westfall Act ruling. ECF Nos. 258, 263. Defendant Myers refiled his present motion to dismiss. ECF No. 261. The remaining

Defendants also refiled their motions to dismiss, ECF Nos. 274, 276, 308, which will be addressed in a forthcoming order.

## II.  LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must allege facts, accepted as true and interpreted in the light most favorable to the plaintiff, to state a claim to relief that is plausible on its face. *See, e.g., Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016). A plausible claim is one that allows the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then a plaintiff has failed to "nudge [the] claims across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quotation omitted). In assessing a claim's plausibility, "legal conclusions" contained in the complaint are not entitled to the assumption of truth. *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The standard, however, remains a liberal pleading standard, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quotation omitted).

## III.  ANALYSIS

Plaintiffs bring one claim against Defendant Myers: an excessive force *Bivens* claim. Defendant Myers argues that a *Bivens* remedy is not available to Plaintiffs, that

10

Plaintiffs fail to state a supervisory liability claim, and that he is entitled to qualified immunity. Because the Court agrees that a *Bivens* remedy is not available, the Court grants the motion to dismiss without addressing Defendant Myers' other arguments.[2]

### A. *Bivens* Claim

Defendant Myers argues that the *Bivens* claim should be dismissed because allowing a *Bivens* remedy would be an impermissible expansion of *Bivens* to a new context. ECF No. 261 at 5. Plaintiffs disagree. ECF No. 283 at 4.

*Bivens* claims allow plaintiffs to seek damages from a federal officer for a violation of a constitutional right in certain contexts. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971). The original *Bivens* case involved a violation of the Fourth Amendment's prohibition on unreasonable search and seizure. *Id.* at 395 ("[D]amages may be obtained for injuries consequent upon a violation of the Fourth Amendment."). Since then, the Supreme Court extended the remedy to two additional contexts: (1) a claim for gender discrimination in employment under the Fifth Amendment's Due Process Clause, *Davis v. Passman,* 442 U.S. 228 (1979); and (2) a claim for failure to provide adequate medical treatment under the Eighth Amendment, *Carlson v. Green,* 446 U.S. 14 (1980). However, the Supreme Court, now much less favorable toward implied causes of action in general, has declined to extend *Bivens* remedies to any new context and has cautioned against doing so. *See Ziglar v. Abbasi*,

---

[2] Generally, courts first determine whether a *Bivens* action exists before analyzing qualified immunity. *See Big Cats of Serenity Springs, Inc. v. Vilsack*, 843 F.3d 853, 858 (10th Cir. 2016) (analyzing *Bivens* claim before qualified immunity claim); *Ioabe v. Hodges*, 939 F.3d 945, 951 (9th Cir. 2018) ("Before reaching the issue of qualified immunity, the first question we must address is whether [the plaintiff] may bring a *Bivens* suit.").

582 U.S. 120, 135 (2017); *Egbert v. Boule*, 596 U.S. 482, 492 (2022); *Noe v. United States*, No. 21-cv-3340-CMA-STV, 2024 WL 1469406 (D. Colo. Feb. 5, 2024) (describing the increasingly unfavorable jurisprudence towards *Bivens* claims). After *Egbert*, expanding the *Bivens* remedy "is now a disfavored judicial activity" such that "[e]ven a single sound reason to defer to Congress is enough to require a court to refrain from creating such a remedy." *Id.* (quoting *Ziglar*, 582 U.S. at 135).

The Supreme Court in *Egbert* articulated a two-step inquiry to determine whether to allow a *Bivens* claim, but clarified that the essential question is "whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* Courts first ask "whether the case presents a new *Bivens* context—*i.e.*, is it meaningfully different from the three cases in which the Court has implied a damages action." *Egbert*, 596 U.S. at 492 (internal quotation marks omitted). Second, "if the claim arises in a new context, a *Bivens* remedy is unavailable if there are special factors indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." *Id.* (internal quotation marks omitted). The second inquiry involves determining whether there was any alternative remedial structure present or other "special factor counselling hesitation" in creating an implied remedy. *Id.*

Following *Egbert*, the Tenth Circuit has announced that expanding *Bivens* is "impermissible in virtually all circumstances" and that *Bivens* is "now all but dead." *Silva v. United States*, 45 F.4th 1134, 1140 (10th Cir. 2022); *Rowland v. Matevousian*, 121 F.4th 1237, 1242 (10th Cir. 2024). After *Egbert*, if a case arises in a new context, courts "may dispose of *Bivens* claims for two *independent* reasons: Congress is better

12

positioned to create remedies" in that context, and "the Government already has provided alternative remedies that protect plaintiffs." *Silva*, 45 F.4th at 1141.

### 1. New Context

The Court first addresses whether this case arose in a new context. *Rowland*, 121 F.4th at 1242. The inquiry of whether the case arises in a new context is, essentially, a question of whether the facts of the case are "materially different" from the facts of the recognized *Bivens* claims. *Id.*

Defendant Myers argues that this case arose in a new context: the Supreme Court has not recognized a *Bivens* claim for BOP employees' use of alleged excessive force against other BOP employees during a training exercise. Defendant Myers relies on *Silva*, in which the Tenth Circuit held that a prisoner could not bring a *Bivens* claim against a corrections officer for excessive force.[3] 45 F.4th 1134. Plaintiffs argue that this is not a new context, but instead is a "quintessential *Bivens* claim arising from the 'common and recurrent sphere' of an unlawful seizure under the Fourth Amendment." ECF No. 283 at 6 (citing *Ziglar*, 582 U.S. at 134).

However, Plaintiffs do not fully consider the recent jurisprudence on what constitutes a new context. The Supreme Court "has said in effect that almost any difference between the case at hand and the three Court precedents can justify rejecting a cause of action." *Logsdon v. U.S. Marshal Serv.*, 91 F.4th 1352, 1355 (10th Cir. 2024) (citing *Egbert*, 596 U.S. at 503 (Gorsuch, J. concurring) ("Candidly, I struggle to see how

---

[3] The claim was original brought under the Eighth Amendment's prohibition against cruel and unusual punishment, but the Tenth Circuit recognized that it was really an excessive force claim.

13

this set of facts differs meaningfully from those in *Bivens* itself.")). "Small differences can easily satisfy the new context inquiry." *Rowland*, 121 F.4th at 1243 (citing *Ziglar*, 582 U.S. at 147).

Thus, the first step is a fact-intensive inquiry to determine whether any small, material differences exist between the present case and the three original *Bivens* contexts. For instance, in *Rowland*, the Tenth Circuit held that the case arose in a new context from *Carlson*, even though it was also an Eighth Amendment deliberate indifference claim against prison officials. *Id.* ("[E]ven significant parallels to one of the Court's previous *Bivens* cases may not be enough to show that a case arises in the same context." (citing *Ziglar*, 582 U.S. at 147)). The Tenth Circuit held that the circumstances were materially different from those in *Carlson*, and thus involved a new context, because (1) the prison officials acted pursuant to doctor's orders, whereas in *Carlson* they acted against doctor's orders; (2) the prison officials did not give the petitioner contra-indicated drugs, knowingly keep him in a "grossly inadequate" medical facility, or prescribe the use of a medical instrument that was "known to be inoperative," as the officials in *Carlson* had; and (3) the petitioner ultimately did receive the treatment he sought, unlike in *Carlson*. *Id.*

The question here becomes whether the facts of the claim are materially different from those cases where the Supreme Court has previously recognized a *Bivens* claim. Of the three cases where the Supreme Court has recognized a *Bivens* claim, *Bivens* itself is the most similar to the present case. The Court finds, however, that the facts here are materially different from those in *Bivens.*

In *Bivens*, the case arose from an arrest and search, during which Federal Bureau of Narcotics agents entered petitioner's apartment, manacled him, threatened to arrest his family, and used unreasonable force in arresting the petitioner. *Bivens*, 403 U.S. 388. The present case involves BOP officials, not Federal Bureau of Narcotics agents; Plaintiffs were co-workers of Defendants, not citizens subject to search and arrest; the situation arose out of a training exercise, not a warrantless search; the situation occurred in a prison, not in a home; and the claim is for excessive force, not unreasonable search and seizure.

Thus, because Plaintiffs' claims are materially different from any of the three Supreme Court cases where a *Bivens* cause of action has been recognized, this claim arises in a new *Bivens* context.

### 2. Alternative Remedy

The Court then turns to the second inquiry: whether any alternative remedy exists, or whether there are special factors that warrant hesitation in creating a new *Bivens* remedy. The Court begins by identifying any alternative remedial schemes available to Plaintiffs. *See Silva*, 45 F.4th at 1142. In analyzing whether an alternative remedy precludes a *Bivens* claim, courts consider "the nature and extent of the statutory scheme created by Congress, and assess the significance of that scheme in light of the factual background of the case at hand." *Big Cats of Serenity Springs, Inc. v. Vilsack*, 843 F.3d 853, 861 (10th Cir. 2016). "The appropriate consideration is whether an alternate, existing process demonstrates Congress's intent to exclude a damages remedy." *Id.* (citing *Schweiker*, 487 U.S. at 435). "Evidence of that intent would be a scheme that provides

adequate deterrence of constitutional violations and at least some form of relief for the harm." *Id.* (citing *Malesko*, 534 U.S. at 70).

Defendant Myers argues that Plaintiffs do have alternative remedies available to them. First, he argues that inspectors general are authorized to investigate and report civil rights abuses by federal law enforcement officers. *See* 5 U.S.C. §§ 402, 413(b). The Court agrees that this is an available alternative remedy. The Tenth Circuit in *Logsdon* held that "the internal USMS grievance procedure and the Department of Justice's Office of the Inspector General (OIG) investigation procedure are adequate alternative remedies." 91 F.4th at 1359. The BOP is similarly a Bureau within the Department of Justice, and it is undisputed that the OIG conducted an investigation regarding this incident. The Supreme Court and Tenth Circuit have made clear that "it is not the judiciary's function to assess the adequacy of executive orders or legislative remedies in deterring constitutional violations." *Id.* at 1360. Thus, an alternative remedy exists such that Congress is better positioned to weigh the appropriateness of a damages remedy in this context.[4]

---

[4] Defendant Myers also argues that the Federal Tort Claims Act (FTCA) is an alternative remedy. 28 U.S.C. § 2679. *See Schwarz v. Meinberg,* 761 Fed. Appx. 732, 734-35 (9th Cir. 2019) (holding that FTCA is an alternative remedy precluding *Bivens* action). However, the Court is not convinced that the FTCA is an adequate alternative remedy. The FTCA provides a federal cause of action for torts against the United States, not individual federal actors. *See Smith v. United States*, 561 F.3d 1090, 1101 (10th Cir. 2009); *Carlson v. Green*, 446 U.S. 14, 19–23 (1980) (finding it "crystal clear" that Congress intended the FTCA and *Bivens* to serve as "parallel" and "complementary" sources of liability). Because the FTCA does not apply against individual actors, it does not have the same deterring effect as *Bivens*. *See Mccullon v. Parry*, No. 18-cv-00469-NYW, 2021 WL 877718, at *7 (D. Colo. Mar. 9, 2021). Defendant Myers also argues that the Federal Employees' Compensation Act (FECA), 5 U.S.C. §§ 8102–93, is an available remedy. FECA addresses work-related injuries of federal employees. *Id.* It covers claims "for the disability or death of an employee resulting from personal injury sustained while in the performance of his duty." 5 U.S.C. § 8102(a). FECA "limits an employee's remedy against the Government, as employer, to the confines of the statute." *Allman v. Hanley*, 302 F.2d 559, 563 (5th Cir. 1962). However, numerous circuit courts have held that FECA does not bar a federal employee's suit against individual coworkers. *See, e.g., Salazar v. Ballesteros*, 17 Fed. Appx. 129, 130–31 (4th Cir. 2001) (holding that FECA does not prohibit suits against fellow

### 3. Special Factors

Defendant Myers also argues that numerous factors counsel against recognizing a *Bivens* claim. As to the "special factors" inquiry, the question is not "whether *Bivens* relief is appropriate in light of the balance of circumstances in the particular case," but instead whether there is "*any* rational reason" to think that Congress is "better suited to weigh the costs and benefits of allowing a damages action to proceed." *Egbert*, 596 U.S. at 496 (internal quotation marks omitted). In other words, "if there is any reason to think that judicial intrusion into a given field might be harmful or inappropriate," or the "*potential* for such consequences," a court cannot allow a *Bivens* remedy. *Id.* (internal quotation marks omitted).[5] Similarly, "if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy[,] the courts must refrain from creating [it]." *Ziglar*, 582 U.S. at 135.

Defendant Myers argues that this case involves special factors because it involves federal employees suing other federal employees. ECF No. 261 at 8. The Supreme Court had previously affirmed the Fifth Circuit's denial of a *Bivens* claim in the context of a federal employee suing his supervisor. *Bush v. Lucas*, 647 F.2d 573, 577 (5th Cir. 1981) *aff'd* 462 U.S. 367 (1983). Inferring a *Bivens* remedy in such a context, the Fifth Circuit reasoned,

> would tend to interfere with and undermine the traditional control of the Government over its internal and personnel

---

employees); *Heathcoat v. Potts*, 790 F.2d 1540, 1543 (11th Cir.1986) (same); *Davis v. Harrod*, 407 F.2d 1280, 1282 n. 2 (D.C.Cir.1969). Similarly, at least one circuit has held that FECA does not bar *Bivens* actions against individual federal employees. *Gustafson v. Adkins*, 803 F.3d 883, 890 (7th Cir. 2015). FECA thus does not bar *Bivens* claims against individual federal employees.

[5] The Supreme Court in *Egbert* determined that a court is not competent to authorize a damages action against Border Patrol agents in part because of the special factor of national security considerations. *Id.*

> affairs. It might encourage aggrieved employees to bypass the statutory and administrative remedies in order to seek direct judicial relief and thereby deprive the Government of the opportunity to work out its personnel problems within the framework it has so painstakingly established. Ultimately, it would provide a disincentive for Congress to continue improving the mechanisms by which an aggrieved employee can protect his rights.

*Id.* at 577. Plaintiff argues that *Bush* is distinguishable because the employees there were suing their coworkers, not a supervisor. However, the reasoning applies equally to coworkers as it does to supervisors, because both involve the government's control over its internal and personnel affairs.

Defendant Myers also argues that special factors exist because the claim arose from a mock training exercise, which implicates the prison's security practices. ECF No. 261 at 11. In the context of the use of force during a prison disturbance, the Supreme Court has noted that "the admonition that a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators carries special weight." *Whitley v. Albers,* 475 U.S. 132, 321 (1986). While training exercises are undoubtedly different than using force in response to a prison disturbance, the rationale for leaving matters of security to prison administrators appropriately applies here. These concerns are especially prevalent here because the claim is against Defendant Myers in his supervisory capacity. Thus, judicial intrusion in prison security may lead to unintended consequences that Congress is better positioned to evaluate. Because this special factor exists, the Court cannot create a new *Bivens* remedy here.

\* \* \*

Thus, because a *Bivens* remedy is unavailable, Defendant Myers's motion to dismiss is granted.

## IV. CONCLUSION

Consistent with the above analysis, the Court GRANTS Defendants' motion to dismiss, ECF No. 261.

Dated this 18th day of March 2025.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge